

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD75566 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | November 12, 2014 |
| JOHN M. RAMIREZ, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Johnson County, Missouri**
The Honorable Jacqueline A. Cook, Judge

Before Division Three:  Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge
and Gary D. Witt, Judge

John M. Ramirez ("Ramirez") appeals his convictions of second-degree murder and second-degree arson following a jury trial.  Ramirez argues that the trial court erred by denying his motion to suppress a statement he claims was obtained in violation of his Fifth Amendment privilege against self-incrimination.  Ramirez also argues that the trial court committed plain error by failing to *sua sponte* instruct the jury to disregard a portion of the State's closing argument that Ramirez claims improperly vouched for the credibility of a witness.

We affirm.

## Factual and Procedural History[1]

Ramirez was seen talking to 91-year-old Maxine Ballew ("victim") on the evening of September 16, 2009, outside her home in Warrensburg. The victim did not place her garage can outside her home that night, as per her normal routine, and her neighbors noticed that her house was on fire the following morning. Firefighters extinguished the blaze and found the victim's body on top of her bed. She was fully clothed with her skin and clothes charred from the fire. The cause of death was manual strangulation. The State Fire Marshal's Office determined that the fire had been deliberately set in two places, one in the victim's bedroom where she was found and the other in the dining room. The house appeared to be ransacked before the fires were set.

A few days after the fire, Ramirez went to the home of two acquaintances to try and sell them some jewelry. Ramirez pulled the jewelry from a plastic bag out of his backpack. Among the pieces were bobby pins, broaches, beaded necklaces, and fake rings, items that one of the acquaintances described as jewelry that an older woman would own. One of the rings contained the initials "MJB" and another had a name tag with the name "Ballew" on it. One of the acquaintances, who noticed scratches on Ramirez's arm, bought the jewelry and eventually turned it over to police. The victim's niece testified that a green necklace sold by Ramirez resembled a necklace owned by the victim.

---

[1]We view the facts in the light most favorable to the jury's verdict. *State v. Rinehart*, 383 S.W.3d 95, 98 n. 3 (Mo. App. W.D. 2012).

Police contacted Ramirez after they learned that he had been seen by a neighbor talking to the victim the day before the fire. Ramirez voluntarily went to the Warrensburg Police Department to talk to police investigators on September 22, 2009, and brought a backpack with him. Ramirez was given his *Miranda*[2] warnings and waived them. Ramirez initially denied being on the street where the victim lived the day before the fire but later admitted to being on the street when told he was seen there by one of the victim's neighbors. Ramirez denied talking to anyone. Police found wind chimes in Ramirez's backpack, and Ramirez said he bought them at a consignment store, though the consignment store owner said they did not come from his store. Toward the end of the interview, Ramirez invoked his right to counsel after investigators asked him a second time to submit to a voice stress test. Ramirez was taken into custody at the end of the interview and transferred to the booking room.

While in the booking room, Ramirez was approached by a detective who arrived to collect DNA evidence from Ramirez's fingernails. The detective told Ramirez, who was uncooperative and belligerent, that she knew he had invoked his right to counsel and was not there to ask him incriminating questions. She asked whether Ramirez recalled signing probation papers from a prior charge that included a consent to search provision. Ramirez did not think he had consented to a search, so the detective read the provision from the probation papers that she brought with her to the booking room. Ramirez did not understand what searching his "person" meant, so the detective tried to explain that term to him. After that discussion, Ramirez did not give the detective consent to take the

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

fingernail scrapings. As a result of the lack of consent, the detective put gloves on Ramirez in order to secure the potential DNA evidence from his fingernails and was going to handcuff Ramirez to the wall of the booking room while she sought a search warrant. Once the detective put the gloves on Ramirez, he said "fine, take it," took the gloves off, and threw them on a counter, saying "it's just prison time." The detective proceeded to collect a DNA sample.

Ramirez was later held in the Lafayette County Jail and got into a verbal altercation with another inmate in which Ramirez said "why don't you catch a real case like a murder charge." Following the altercation, Brandon Freid ("Freid"), another inmate in the jail with Ramirez, asked Ramirez how he could kill an old woman. Ramirez answered that she "was going to call the cops." A third inmate asked Ramirez if he thought he was tough because he killed an old woman and Ramirez said "everybody has something coming to them." When another inmate asked Ramirez how he could burn an old woman inside her house, Ramirez shrugged his shoulders and walked away. Freid testified to all of these comments at trial.

Ramirez filed a motion to suppress the statement "it's just prison time" because he said it was obtained in violation of his Fifth Amendment privilege against self-incrimination.[3] After a pre-trial hearing on the motion to suppress, the trial court denied the motion to suppress. During the trial, Ramirez again objected to the detective's

---

[3]Ramirez did not move to suppress the collected DNA evidence or the results of the collected DNA sample which did not exclude Ramirez as a suspect.

4

testimony that Ramirez said "it's just prison time" after taking the gloves off. The trial court overruled the objection, and Ramirez's statement was admitted into evidence.

During its closing argument, the State recalled for the jury the witnesses it had called and reviewed their testimony. In referring to Freid, the State said he "sat right there and was totally honest with you," specifically referencing Freid's testimony about his prior drug charges and prior cooperation with the police. Ramirez did not object to the State's characterization of Freid as "honest."

The jury convicted Ramirez of both counts, and a judgment of conviction and sentence was entered.

Ramirez timely filed this appeal, setting forth two points of error.

## I. Point One

In his first point, Ramirez argues that the trial court erred by denying his motion to suppress his statement "it's just prison time" and by allowing the statement to be admitted into evidence. Ramirez contends that the detective's actions in attempting to collect DNA evidence from him after he invoked his right to counsel were the functional equivalent of interrogation and, therefore, his statement could not be admitted into evidence because it was obtained in violation of his Fifth Amendment privilege against self-incrimination.

### A. Standard of Review

In reviewing a trial court's ruling on a motion to suppress, there must be "substantial evidence" to support the ruling. *State v. Gaw*, 285 S.W.3d 318, 319 (Mo. banc 2009) (internal quotations omitted). The trial court's ruling "will be reversed only if it is clearly erroneous." *State v. Irvin*, 210 S.W.3d 360, 361 (Mo. App. W.D. 2006).

5

"The ruling is clearly erroneous if we are left with a definite and firm belief a mistake has been made." *Id.* at 361-62. We consider both the evidence presented at the suppression hearing and at trial to determine whether substantial evidence exists to support the trial court's ruling. *Gaw*, 285 S.W.3d at 319. We give "deference to the trial court's factual findings and credibility determinations, but review[] questions of law *de novo*." *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

## B. Analysis

*Miranda* safeguards against self-incrimination apply whenever an individual is in custody and subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291 (1980). Interrogation under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301. "When the accused requests an attorney, all interrogation must stop until counsel has been provided." *State v. Baldwin*, 290 S.W.3d 139, 144 (Mo. App. W.D. 2009).

Ramirez argues that the detective's actions in attempting to collect DNA evidence from him after he invoked his right to counsel were the functional equivalent of interrogation because her actions were reasonably likely to elicit an incriminating response.[4] We need not decide if the detective's actions amounted to interrogation in violation of Ramirez's Fifth Amendment rights because "we conclude that the [trial] court's refusal to exclude the statement[] would at most constitute 'harmless error.'" *State*

---

[4]Ramirez did not seek to suppress the DNA sample and has not claimed at any time that his Sixth Amendment right to counsel was violated by the effort to procure a DNA sample from him after he had invoked his right to counsel. We express no opinion, therefore, on the propriety of the effort to secure physical evidence from Ramirez after he had invoked his right to counsel.

6

*v. Fuente*, 871 S.W.2d 438, 443 (Mo. banc 1994) (quoting *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The violation of an accused's Fifth Amendment right against self-incrimination does not require the automatic reversal of a conviction. *Chapman*, 386 U.S. at 22. Rather, "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id*. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. "Under this test, the 'beneficiary of a constitutional error,' the State, must 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Whitfield*, 107 S.W.3d 253, 262 (Mo. banc 2003) (quoting *Chapman*, 386 U.S. at 24).

Ramirez and the State disagree about what the State must demonstrate to meet this burden. Ramirez contends that the State must show that the improperly admitted evidence obtained in violation of *Miranda* had no possible influence on the jury's verdict. To support this proposition, Ramirez relies on *Chapman's* holding that "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and that "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." *Chapman*, 386 U.S. at 23-24 (quoting *Fahy v. State of Connecticut*, 375 U.S. 85, 86-87 (1963)). The State, on the other hand, argues that the harmless error standard is

met if the record contains substantial evidence aside from the improperly admitted evidence that supports the jury's guilty verdict, citing *State v. Minner*, 256 S.W.3d 92, 96-97 (Mo. banc 2008).

We do not agree with Ramirez's construction of *Chapman*. Requiring the State to prove that improperly admitted evidence had no possible influence on a jury is tantamount to requiring automatic reversal of a conviction in the face of a constitutional violation, as it is impossible to conceive how the State would ever be able to prove such a proposition. *Chapman* plainly rejects the prospect of automatic reversal, and directs a harmless error standard that recognizes the relative harm improper evidence may inject depending on its strength, its relevance, and the presence of other evidence of guilt.

> In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one. What harmless-error rules all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, as far as possible.

*Id.* at 22-23. This analysis recognizes the existence of a harmless error continuum that is not subject to absolute application, but along which various factors must be balanced and weighed to determine whether a court can conclude that the improperly admitted evidence "was harmless beyond a reasonable doubt." *Id.* at 24.

Here, the State has met that burden. That is particularly so in light of the fact that Ramirez's statement to the detective implicating himself was cumulative of other properly admitted evidence wherein Ramirez implicated himself. "When evidence challenged on constitutional grounds is cumulative of other properly-admitted evidence, the disputed

8

evidence could not have contributed to the defendant's conviction and is harmless beyond a reasonable doubt." *State v. Sachs*, 372 S.W.3d 56, 64 (Mo. App. W.D. 2012) (internal quotations omitted); *see Fuente*, 871 S.W.2d at 444 (holding that a defendant's improperly admitted statement was cumulative to other properly admitted statements made by defendant and, thus, did not contribute to the defendant's conviction).

Along with Ramirez's statement to the detective, the State also introduced three other statements made by Ramirez to other inmates while in custody at the Lafayette County Jail. When asked by another inmate if Ramirez thought he was tough because he killed an old woman, Ramirez responded: "Everybody has something coming to them." After another inmate asked Ramirez how he could kill an old woman, Ramirez responded: "She was going to call the cops." Ramirez also said "Why don't you catch a real case like a murder charge" to other inmates and just shrugged his shoulders when an inmate asked him how he could set fire to the old woman's house while she was inside. These statements were admitted without objection. Any alleged error made by the trial court in failing to suppress Ramirez's statement to the detective was harmless beyond a reasonable doubt.

Point one is denied.

## I. Point Two

In his second point, Ramirez argues that the trial court erred when it failed to *sua sponte* instruct the jury to disregard a portion of the State's closing argument that Ramirez claims improperly vouched for Freid's credibility. Ramirez acknowledges that an

objection to the closing argument was not made at trial, thus limiting this point to plain error review.

## A. Standard of Review

"Issues that were not preserved may be reviewed for plain error only, which requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error." *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). "Plain error will seldom be found in unobjected to closing argument." *State v. Radley*, 904 S.W.2d 520, 524 (Mo. App. W.D. 1995). "[A]ny assertion that the trial court erred for failure to intervene *sua sponte* ignores the possibility that an attorney may not have objected for strategic reasons." *State v. Bennett*, 201 S.W.3d 86, 88 (Mo. App. W.D. 2006). "Without an objection, 'the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.'" *Id.* (quoting *State v. Clemmons*, 753 S.W.2d 901, 908 (Mo. banc 1988)). "A conviction will be reversed based on plain error in closing argument only when it is established that the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice." *State v. Edwards*, 116 S.W.3d 511, 536-37 (Mo. banc 2003).

## B. Analysis

"Vouching occurs when a prosecutor implies that he or she has facts establishing the veracity of a state's witness that are not before the jury for their consideration." *Glover v. State*, 225 S.W.3d 425, 430 (Mo. banc 2007). "Stating that a witness is telling the truth does not constitute vouching as long as the prosecutor does not imply that the statement is based on evidence not before the jury." *Id.* "The entire record is considered

10

when interpreting a closing argument, not an isolated segment." *State v. Johnson*, 284 S.W.3d 561, 573 (Mo. banc 2009).

Ramirez argues that the State improperly vouched for Freid during closing argument by saying Freid sat on the stand and "was totally honest" with the jury. Ramirez claims that this was plain error that amounted to manifest injustice. Yet Ramirez's argument ignores that immediately after the allegedly improper statement the State referenced Freid's testimony about past issues with drugs and past cooperation with law enforcement in order to receive a benefit for the criminal charges related to that drug use. The State was not implying that Freid was honest based on facts not before the jury. Rather, the State stated that Freid was honest because of his specific testimony about past drug charges and past cooperation with law enforcement. *See Glover*, 225 S.W.3d at 430 (holding a prosecutor's statements were not improper vouching when the prosecutor specifically referred to a witness's trial testimony). The State committed no error in its closing argument, plain or otherwise, requiring the trial court to intervene *sua sponte*.

Ramirez also argues that the State's use of the word "honest" in and of its self implies reference to facts not before the jury. Ramirez claims said that the State could have used the words "candid" or "open" instead of "honest," as those words would have directly indicated an intent to reference only the testimony provided by Freid at trial. But this is a distinction without a difference. A jury would not make a distinction between the words "honest" and "candid" or "open," especially in light of the fact that the commonly understood meaning of "candid" means "marked by honest sincere

11

expression," and of "open" means "completely free from concealment." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY pg. 325, 1579 (1993).

The State did not improperly vouch for Freid during closing argument. The trial court, therefore, did not commit plain error in failing to intervene *sua sponte* during the State's closing argument.

Point two is denied.

**Conclusion**

We affirm.

Cynthia L. Martin, Judge

All concur.