

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD77672 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | July 28, 2015 |
| WILLIAM ERNST PETERSON, JR., | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Morgan County, Missouri**
**The Honorable Donald Barnes, Judge**

**Before Division Three:** Karen King Mitchell, Presiding Judge, and
Lisa White Hardwick and Anthony Rex Gabbert, Judges

William Peterson appeals, following a jury trial, his convictions of trafficking in the first degree, § 195.222,[1] and three counts of endangering the welfare of a child in the first degree, § 568.045, for which the court sentenced him, as a prior offender, to a total of fourteen years' imprisonment. Peterson raises two claims on appeal: first, he argues that the evidence was insufficient to support his convictions; and second, he argues that the prosecutor misrepresented the evidence during closing argument. Because the evidence was sufficient to support the

---

[1] All statutory citations are to the Revised Statutes of Missouri 2000, as updated through the 2011 Cumulative Supplement, unless otherwise noted.

convictions and because Peterson has failed to demonstrate any prejudice resulting from the prosecutor's alleged misstatement during closing argument, his convictions and sentences are affirmed.

**Background**

On April 5, 2012, around 6:20 p.m., Officer Brian Pratt of the Lake Area Narcotics Enforcement Group, went to Peterson's home in Stoutland, Missouri, which Peterson shared with Wife, Stepdaughter (then age 14), Stepson, Daughter-in-law (Stepson's wife), and two grandchildren (Stepson and Daughter-in-law's children, then ages 1 and 2). Officer Pratt was conducting a methamphetamine drug investigation based upon information that all four adult household members (Peterson, Wife, Stepson, and Daughter-in-law) had been purchasing pseudoephedrine in quantities consistent with the manufacture of methamphetamine. When he arrived at the residence, Officer Pratt found Wife and Daughter-in-law outside; another officer advised the women that the officers were investigating possible drug activity on the premises, and they requested consent to search.[2] Wife refused to allow the officers to search. Officer Pratt then asked if Stepson was around. Daughter-in-law indicated that he was, and she brought him outside. Officer Pratt asked Wife and Stepson about recent pseudoephedrine purchases, and both Wife and Stepson produced the pills they had purchased in the preceding two days.

While Officer Pratt was speaking with Wife, another officer advised Officer Pratt that, as he was walking back to his patrol vehicle, he saw in the yard what turned out to be a gas generator—an item of paraphernalia that is used in the "salting out" stage of the one-pot methamphetamine manufacturing process.[3] Officer Pratt then advised Wife, Stepson, and

---

[2] Officer Pratt testified that he smelled a strong chemical odor coming from the residence.
[3] Officer Pratt described the one-pot method as follows:

Daughter-in-law of their *Miranda* warnings[4] and that he was securing the residence pending application for a search warrant. The other officer briefly searched the home to see if anyone else was present, and he found the three minor children, so he brought them outside as well. Peterson arrived at the residence twenty-to-thirty minutes later. At that time, Officer Pratt introduced himself as a narcotics officer, explained why he was at Peterson's residence, advised Peterson of his *Miranda* warnings, and explained that the residence was being secured pending application for a search warrant.

About two hours later, a search warrant was secured, and Officer Pratt and others executed the warrant, searching both the residence and two outbuildings on the property. Just inside the main entryway of the residence, officers found a locked "tool room," which contained most of the evidence that was ultimately seized. Inside the tool room was "everything you need chemical-wise or precursor-wise to manufacture methamphetamine." There were lithium batteries, fertilizer sticks, lye, sulfuric acid, salt, eleven cans of camp fuel, a digital scale, a pill crusher, filters, and pseudoephedrine, along with a "meth pipe" containing residue. There were also seven glass jars and nine plastic containers (described as one-pot meth labs) with various

---

[W]hen you manufacture meth in the one-pot method, you need a solvent, which they typically will use camp fuel, you need lye, . . . you need pseudoephedrine, which is your main ingredient, lithium, strips out of lithium batteries, and you need ammonium nitrate, which typically [come from] an instant cold pack . . . or fertilizer stakes. . . . They combine all of this into . . . some sort of plastic vessel. They'll add a little bit of water and it causes a reaction with all the chemicals, and what's left is—the liquid that's left is the meth oil.
  . . . .
  While it's increasing pressure at times they'll have to do what they call burping it and they'll actually have to release pressure from the bottle while they're shaking it. So they'll take the cap and they'll loosen it up. And it's dangerous. I mean, it's ammonia, which can burn your lungs, your eyes. It's—So once they do that—I don't know how long they shake it. It depends on the cook. I've heard cooks say they shake it for 45 minutes. I've heard cooks say[] two hours. That's when they have their meth oil.
  . . . And then what they do is, they strain that liquid through filters into a jar . . . , and it leaves that—that salt. And that's when you use your gas generator, to get your final meth. . . . [W]hen they're using the gas generator, it will—the meth will flake out into that liquid, and then they've got to filter it again and then dry it out, and that's when you get your final product.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

liquids, all found to contain methamphetamine, as well as two bags of powdered methamphetamine. Inside the tool room, officers also located a Laclede Electric bill in Peterson's name, as well as an envelope addressed to Peterson.

In one of the outside sheds, officers located more one-pot meth labs, containers of liquid, and numerous other items associated with the manufacture of methamphetamine, along with multiple items of "lab trash," such as empty blister packs, battery cases, used filters, and empty Sudafed boxes. The total amount of liquid seized that contained methamphetamine was 1401.63 grams. Of that amount, 1019.27 grams were located in the tool room, alone. Officer Pratt described the residence as "the biggest one-pot meth lab I've ever worked."[5]

At Peterson's trial, both Stepson and Wife refused to testify, despite being ordered to do so by the court. Daughter-in-law, however, testified that the tool room was always locked and that only Peterson, Wife, and Stepson had keys to the room. Daughter-in-law testified that all three individuals would go in and out of the room, sometimes individually, and sometimes together; she indicated that Peterson spent the most time of any of the three in the tool room. She testified that Peterson habitually went into the room right after returning home from work around 5:00 or 6:00 p.m. and that she would not see him again until the next day. She further indicated that he spent a large portion of his time during the weekends in the tool room.

During closing argument, the prosecutor argued:

This, ladies and gentlemen, is a really big deal. This is incredibly dangerous, as testified to by Task Force Officer Pratt. These are chemicals. These are possibly—well, they are flammable, possibly explosive. And it is not okay to manufacture 1,400 grams of methamphetamine.
I am asking you send a message to the community that this is not okay.
When you add in the aggravating factor of the three children, it's not that it's not okay, it's extremely dangerous.

---

[5] Officer Pratt testified that he had been "dismantling meth labs for 12 years."

The jury found Peterson guilty of first-degree trafficking and three counts of first-degree child endangerment. The court sentenced Peterson, as a prior offender, to concurrent terms of fourteen years for first-degree trafficking, and three years for each count of child endangerment. Peterson appeals.

**Analysis**

Peterson raises two points on appeal. In his first point, he challenges the sufficiency of the evidence to support his convictions; specifically, he argues that the evidence was insufficient to establish his involvement in the methamphetamine manufacturing occurring on his property, so as to support the first-degree trafficking conviction.[6] In his second point, he argues that the trial court plainly erred in failing to sua sponte declare a mistrial or give a curative instruction to the jury when the prosecutor allegedly misstated the evidence during closing argument.

**A. The evidence was sufficient to support the convictions.**

"'Where a criminal defendant challenges the sufficiency of the evidence to support [his] conviction, [an appellate c]ourt's review is limited to determining whether sufficient evidence was admitted at trial from which a reasonable trier of fact could have found each element of the offense to have been established beyond a reasonable doubt.'" *State v. Parshall*, 454 S.W.3d 928, 930 (Mo. App. W.D. 2015) (quoting *State v. Burrell*, 160 S.W.3d 798, 801 (Mo. banc 2005)). "'This Court accepts as true all evidence favorable to the verdict and disregards all evidence and inferences to the contrary.'" *Id*. (quoting *Burrell*, 160 S.W.3d at 801).

"A person commits the crime of trafficking drugs in the first degree if . . . he . . . manufactures . . . more than thirty grams of any material, compound, mixture or preparation which contains any quantity of . . . methamphetamine . . . ." § 195.222.8. "If the quantity

---

[6] Because the child endangerment convictions are all premised on Peterson's manufacture of methamphetamine, he argues that those convictions should likewise be reversed due to the insufficient evidence supporting the trafficking conviction.

5

involved is ninety grams or more, . . . the person shall be sentenced to the authorized term of imprisonment for a class A felony which term shall be served without probation or parole." *Id*. at (2).

Here, the jury was instructed to find Peterson guilty of first-degree trafficking if either he, Wife, *or* Stepson manufactured more than 90 grams of a substance containing methamphetamine, if *any* of them knew that the substance contained methamphetamine (a controlled substance), and if Peterson, with the purpose of promoting the commission of first-degree trafficking, acted either alone or together with Wife or Stepson. Each of these factual assertions was wholly supported by both the evidence and the reasonable inferences derived therefrom. When viewed in the light most favorable to the verdict, the evidence showed that more than 1400 grams of liquid containing methamphetamine was found on the property, with the bulk of that amount found in the locked tool room inside the residence. Everything needed to manufacture methamphetamine was found inside the tool room, along with nine actual one-pot methamphetamine labs, which held liquids containing methamphetamine in them at the time of the search. Only three people had keys—and therefore access—to the locked tool room: Peterson, Wife, and Stepson. The evidence showed that Peterson spent a considerable amount of time in the tool room and that he spent more time in there than either Wife or Stepson. The *only* reasonable inference from this evidence is that the locked tool room was being used to manufacture the considerable amount of methamphetamine found within it and that Peterson, Wife, and Stepson were all involved in the manufacturing process.

Peterson does *not* argue that the evidence was insufficient to support a finding that methamphetamine was being manufactured on the property. Peterson also does *not* argue that the amount of substance containing methamphetamine failed to meet the 90-gram threshold.

And Peterson does *not* argue that none of the individuals were aware that the substance being manufactured was, in fact, methamphetamine. Rather, Peterson argues that, because he was not present when the officers arrived on the property, and because multiple individuals had access to the tool room, the State was required to present additional evidence linking Peterson, individually, to the manufacturing operation. To support this argument, Peterson relies on several cases involving the constructive possession of drugs.

The fallacy in Peterson's argument, however, is that "possession of the [controlled substance] is not an element of the crime of first-degree trafficking." *State v. Stover*, 388 S.W.3d 138, 146 (Mo. banc 2012). Though such "evidence of knowing possession *may* support the conviction when the state alleges that the defendant *attempted* to distribute, deliver, manufacture or produce the controlled substance," *id*. (emphasis added), the fact remains that the State is not *required* to prove possession as an element of the crime of first-degree trafficking. Thus, Peterson's reliance on cases addressing the requisite proof for constructive possession is misplaced.

This court addressed—and rejected—a claim similar to Peterson's in *State v. Wilson*, 359 S.W.3d 60 (Mo. App. W.D. 2011). In *Wilson*, the defendant was charged, as an accomplice, with first-degree trafficking after officers, executing a search warrant, discovered the defendant and others in a residence that appeared to be the base for a crack cocaine drug operation. *Id*. at 62-63. The defendant argued that the evidence was insufficient to support his conviction because "there was no proof to personally connect him in any way with the manufacturing or production of the crack cocaine at the residence." *Id*. at 67. This court rejected the defendant's claim, noting that, "[u]nder a theory of accomplice liability for drug trafficking, the State was not required to prove that [the defendant] was personally manufacturing the crack cocaine himself in

7

order to convict him." *Id*. Rather, the State needed to prove only that the defendant encouraged the commission of the crime. *Id*. at 68. The State could show encouragement for manufacturing through "evidence that drug-making materials and paraphernalia were found at the scene and that the defendant was aware that illegal drugs were being manufactured at the residence," as well as "[e]vidence that the defendant provided an outlet for the manufacturing operation." *Id*. This court reasoned that "[t]he doctrine of accomplice liability applies to any number of potential acts intended by one person to assist another individual in criminal conduct"; accordingly, "[t]he evidence need not directly place the defendant in the act of committing the crime." *Id*. at 66. In other words, when an individual is charged with first-degree trafficking under a theory of accomplice liability, the State is not required to present additional evidence linking the defendant, individually, to the manufacturing operation.

Here, there was considerable evidence supporting the jury's determination that Peterson, at a minimum, encouraged the manufacturing operation by providing the place for the manufacturing and by his knowledge that a manufacturing operation was ongoing in his residence. Contrary to Peterson's arguments, the State did not need to establish Peterson's presence at the time the officers arrived, nor did it need to establish that Peterson, himself, manufactured the methamphetamine. (Though the evidence certainly supported such a finding.) Accordingly, Peterson's first point on appeal is denied. The evidence was sufficient to support his conviction of first-degree trafficking.[7]

---

[7] Because Peterson's claims of insufficient evidence pertaining to the three child endangerment convictions are premised on the success of his claim of insufficient evidence pertaining to the first-degree trafficking conviction, those claims are likewise denied.

**B. Peterson has failed to demonstrate any prejudice, much less a manifest injustice, resulting from the prosecutor's alleged misstatement of the evidence.**

In his second point on appeal, Peterson argues that the trial court plainly erred in failing to sua sponte declare a mistrial or issue a curative instruction after the prosecutor allegedly misstated the evidence during closing argument. Peterson focuses on the following assertions made by the prosecutor:

> This, ladies and gentlemen, is a really big deal. This is incredibly dangerous, as testified to by Task Force Officer Pratt. These are chemicals. These are possibly—well, they are flammable, possibly explosive. And it is not okay *to manufacture 1,400 grams of methamphetamine.*
> I am asking you send a message to the community that this is not okay.
> When you add in the aggravating factor of the three children, it's not that it's not okay, it's extremely dangerous.

(Emphasis added.) Specifically, Peterson takes issue with the prosecutor's characterization of "1,400 grams of methamphetamine" because the quantity stated referred to the amount of liquid containing methamphetamine found on the property; which is not the same as the amount of a final, consumable product.

Peterson concedes that he neither objected at trial nor included this claim of error in his motion for new trial. Therefore, he requests we review his claim for plain error. Plain error review "requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error." *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). "'Plain error will seldom be found in unobjected to closing argument.'" *State v. Ramirez*, 447 S.W.3d 792, 798 (Mo. App. W.D. 2014) (quoting *State v. Radley*, 904 S.W.2d 520, 524 (Mo. App. W.D. 1995)). "'[A]ny assertion that the trial court erred for failure to intervene *sua sponte* ignores the possibility that an attorney may not have objected for strategic reasons.'" *Id.* (quoting *State v. Bennett*, 201 S.W.3d 86, 88 (Mo. App. W.D. 2006)). "Without an objection, the trial court's options are narrowed to uninvited interference with summation and a

corresponding increase of error by such intervention." *Id*. (internal quotations omitted). "'A conviction will be reversed based on plain error in closing argument only when it is established that the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice.'" *Id*. (quoting *State v. Edwards*, 116 S.W.3d 511, 536-37 (Mo. banc 2003)).

At the outset, it is not plain on the face of the record that the prosecutor misstated the evidence. Officer Pratt, when testifying about the one-pot method for manufacturing methamphetamine, stated that "the minute the reaction starts[,] you already have meth." Thus, the prosecutor's characterization of the 1400 grams of methamphetamine-containing liquid as "methamphetamine" may, in fact, be accurate.

Nevertheless, to demonstrate plain error, Peterson must show both an error plain on its face *and* a resulting manifest injustice. Even assuming that the prosecutor's assertion was inaccurate, Peterson has failed to meet his burden of demonstrating a manifest injustice resulted from the alleged misstatement. In order to find Peterson guilty, the jury had to determine that more than 90 grams of "any *material, compound, mixture or preparation*," containing "*any* quantity of . . . methamphetamine," had been manufactured. § 195.222.8 (emphasis added). A guilty verdict was not dependent upon a finding pertaining to the suitability of the substance for ingestion. In other words, the jury did *not* need to find that there was any particular quantity of *consumable* methamphetamine before finding Peterson guilty. Thus, it does not matter whether the 1400 grams of methamphetamine-containing substance was in a consumable state or had yet to undergo more processing before it was ready for ingestion. In short, though Peterson's argument *might* have merit if the statute referred only to a consumable "final product," the statute is not so limited. And, in any event, the evidence was very clear that the 1400 grams referred to were in liquid form; thus, the likelihood that the jury mistakenly believed the

10

prosecutor's assertion to refer to a consumable form of methamphetamine is minimal, at best. Accordingly, it cannot be said that the alleged misstatement had any effect, much less a "decisive effect," on the jury's verdict.

Point II is denied.

## Conclusion

The evidence was sufficient to support Peterson's convictions, and the trial court committed no error, plain or otherwise, in not intervening during the prosecutor's closing argument. Peterson's convictions and sentences are affirmed.

_____
Karen King Mitchell, Presiding Judge

Lisa White Hardwick and Anthony Rex Gabbert, Judges, concur.