

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101416 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | |
| | ) | Honorable Richard C. Bresnahan |
| BRIAN L. CANNON, | ) | |
| | ) | |
| Defendant/Appellant. | ) | Filed: September 15, 2015 |

## Introduction

Brian Cannon (Defendant) appeals the Circuit Court of St. Louis County's judgment, entered after a jury trial, finding him guilty of first-degree assault of a law enforcement officer, two counts of first-degree burglary, one count of armed criminal action, two counts of stealing a motor vehicle, first-degree trespassing, felony stealing, and unlawful possession of a firearm. On appeal, Defendant claims (1) the trial court erred in overruling his motion to suppress his custodial statements to police, (2) the trial court erred in overruling his motion to suppress the video re-enactment of the shooting of the police officer, and (3) the trial court plainly erred in permitting the prosecutor's statements in closing argument. We affirm.

## Factual Background

In May 2012, Defendant went to his friend's apartment in Florissant. He told his friend that he was going to a party and showed her a handgun that he was planning to show off at the party. He left the apartment in the early hours of the morning. Defendant did not go to a party. Instead, he went into a home on Horseshoe Drive. In the home, Defendant took a purse and keys to a Honda Pilot, which he drove for a while and then abandoned. Then, Defendant broke into a Pontiac Grand Am that was parked in the driveway of a house on Hackney Drive. From the Pontiac, Defendant stole a purse, some change, and some items from the glovebox. Then, Defendant walked to another house on Banstead Drive. He pried open the patio door with a screwdriver, entered the house and took a television. The alarm on the Banstead house went off. Defendant left the house and went into the backyard of a house nearby. He set the television on the patio and left the purse stolen from the Pontiac as well.

A police officer reported to the Banstead house. He saw that the back door was open and determined that the intruder was fleeing the scene. On his police radio, he informed the other officers that he believed the intruder was headed toward the intersection of Hackney Drive and Sorrell Drive.

Defendant had, in fact, run in the direction the officer believed. Defendant ran to the Surrey Plaza shopping center, near the intersection of Hackney and Sorrell. Defendant hid in a dumpster in an alley behind the shopping center. He called his friend and asked her to pick him up.

Officer Michael Vernon heard the radio call about the suspect fleeing toward Hackney and Sorrell. Officer Vernon drove down an alley behind Surrey Plaza. He got out of his vehicle and saw a piece of clothing he thought may have belonged to the suspect. After determining the

piece of clothing was old, Officer Vernon looked around, then decided to head back to his vehicle. He heard something in the dumpster, but continued toward his car. Defendant jumped up and shot at Officer Vernon, who first felt a shot in his calf. Two more bullets hit Officer Vernon, one of which hit his vertebrae and paralyzed him. The other shot entered Officer Vernon's lung. Defendant fled. Officer Vernon fell to the ground and could not move. Another officer arrived at the scene. Officer Vernon was conscious and gave the other officers a description of the shooter—black male with dreadlocks, wearing a white t-shirt and carrying a chrome handgun.

Defendant ran across Lindbergh and into another residential area. He removed his t-shirt and stole a Dodge Caravan. Again, he called his friend and asked for help. When his friend arrived in the area, Defendant abandoned the Dodge and went to his friend's car. Because of the amount of police presence in the neighborhood, Defendant left his friend's car and ran back into the residential area. During this time, police officers and canine units were searching for Defendant in the area and spotted him. One of the patrol canines, Miko, picked up Defendant's scent and tracked him into a garage on Brunswick Drive. When Defendant refused to exit the garage, he was tased by an officer and subsequently arrested. Officers found Defendant's gun in a backyard of the residential neighborhood.

Defendant was taken to the police station, then to the hospital, where he refused treatment and said he was fine. The officers took Defendant back to the police station where he was interviewed by two officers. Before the interview, the officers advised Defendant of his *Miranda*[1] rights. During the interview, Defendant admitted to all of the crimes, but said that when he shot Officer Vernon, he did not know he was shooting a police officer. The officers

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

took Defendant back to the dumpster where he had been hiding earlier and they created a video re-enactment.

Before trial, Defendant filed a motion to suppress his statements to police officers at the station, as well as the video re-enactment. The trial court denied both motions. At trial, the State presented the testimony of the officer who responded to the house on Banstead; the two officers who responded to the scene where Officer Vernon was shot; the officer of the canine patrol unit that tracked Defendant to the garage; Detective Rofling, who interviewed Defendant at the police station; and Officer Vernon. Defendant testified in his defense. The jury found Defendant guilty of all counts and he was sentenced to consecutive terms of life imprisonment for first-degree assault of a law enforcement officer and armed criminal action, and twenty years for first-degree burglary. Those sentences were concurrent with terms of twenty years for the other count of first-degree burglary, seven years for each count of stealing and unlawful possession of a firearm, and six months for trespassing. Defendant appeals.

## Discussion

### Point I: Voluntariness of Custodial Statements

In his first point relied on, Defendant argues that the trial court clearly erred in denying his motion to suppress his custodial statements to police. Defendant contends that he did not voluntarily waive his privilege against self-incrimination because his lack of sleep overcame his will. The State counters that Defendant's statements that he was tired did not render his statements involuntary.

In reviewing a trial court's ruling on a motion to suppress, we are limited to determining whether the trial court's ruling was supported by substantial evidence. *State v. Norfolk*, 366 S.W.3d 528, 531 (Mo. banc 2012). We consider whether sufficient evidence exists in the record

to support the trial court's ruling. *Id.* We defer to the trial court's findings of fact and determinations of credibility. *Id.*

"The test for whether a statement is voluntary is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny or refuse to answer the examiner's questions and whether the physical and psychological coercion was of such a degree that the defendant's will was overborne at the time he made the statement." *State v. Hicks*, 408 S.W.3d 90, 95 (Mo. banc 2013) (quotations omitted). We consider whether the defendant was informed of his rights and understood them, as well as the defendant's physical and mental state, the length of questioning, the presence of police coercion or intimation, and the withholding of food, water or other physical needs. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). The defendant's physical or emotional condition alone, without police coercion, does not demonstrate that his statement was involuntary. *Id.*

Here, Defendant argues that his physical and mental state overbore his choice to refuse to answer the detectives' questions, rendering his statements involuntary. Defendant notes the following: the interrogation lasted more than two and a half hours; Defendant went into a corner and wrapped himself in a blanket; the detective was unaware of Defendant not having slept since the crimes were committed; and Defendant told the detectives that he was tired, but was not allowed to rest or sleep. Viewing the totality of the circumstances, we cannot conclude that Defendant's lack of sleep amounted to police coercion. The officers informed Defendant of his rights multiple times and he nonetheless agreed to speak with them. Defendant's statements during the interview were responsive and it was clear that Defendant understood the questions asked. Further, there are multiple breaks throughout the interview. Defendant was allowed to go

to the bathroom and was also provided with food. The officer provided Defendant with a blanket because he was cold, not because he was tired. Defendant complained that he was tired one time. Defendant stated, "I'm tired. I'm hungry." At that point, the officers told Defendant they would get him something to eat. Defendant followed up, "I can't even lean down. I'm starving. I can't hold myself up. I ain't even ate nothing. I ain't eat nothing yesterday." From these statements, it is clear that Defendant's concern was getting something to eat, and the officers provided him with food and took a break from the interview. While Defendant may have been tired, under these circumstances, it is clear that his lack of sleep did not render his statements involuntary.

Accordingly, viewing the totality of the circumstances surrounding Defendant's interview with the officers, we conclude that Defendant's decision to waive his privilege against self-incrimination was voluntary. As a result, the trial court did not err in denying Defendant's motion to suppress. Point I denied.

**Point II: Revocation of Waiver of Miranda Rights**

In his second point relied on, Defendant contends that the trial court erred in denying his motion to suppress the video re-enactment of the shooting. Defendant argues that during the re-enactment, he revoked his earlier waiver of his *Miranda* rights. The State counters that Defendant's statement was not a clear, consistent, unequivocal invocation of his right to remain silent.

In reviewing a trial court's ruling on a motion to suppress, we are limited to determining whether the trial court's ruling was supported by substantial evidence. *State v. Norfolk*, 366 S.W.3d 528, 531 (Mo. banc 2012). We consider whether sufficient evidence exists in the record

to support the trial court's ruling. *Id.* We defer to the trial court's findings of fact and determinations of credibility. *Id.*

When an individual has been read his *Miranda* rights, if he indicates in any manner, before or during questioning, that he wishes to remain silent, the interrogation must stop. *State v. Jones*, 369 S.W.3d 77, 81 (Mo. App. E.D. 2012). However, the individual's expression of his wish to remain silent must be consistent and clear in order to terminate questioning. *Id.* "If the statement is equivocal or ambiguous, then the police have no obligation to clarify the suspect's intent and may proceed with the interrogation." *Id.* The individual's statements are viewed in their entirety when determining whether the individual unequivocally invoked his right to remain silent. *Id.*

In this case, Defendant argues that he unequivocally invoked his right to remain silent when he told the police officers, "I don't want to re-enact this. I can't, man. I can't." Defendant contends that police officers ignored his revocation and continued to ask him to re-enact the shooting. When viewing Defendant's statements in their entirety, there was sufficient evidence to support the trial court's ruling. The video provides vital context for Defendant's statement. In the video, Defendant and the officers are in the alleyway where Defendant hid in the dumpster and shot Officer Vernon. Defendant willingly answers questions. After Defendant identifies the dumpster where he was hiding, one of the officers suggests that Defendant get into the dumpster to re-enact how he jumped up to shoot Officer Vernon. Defendant then says that he does not want to re-enact this. Defendant follows up that he does not want to jump out of the dumpster and re-enact the shooting. One of the officers follows up and asks Defendant where Officer Vernon was standing, and Defendant willingly shows him. In context, it is clear that Defendant

7

simply did not wish to get into the dumpster, but continued to be willing to answer questions about the incident.

Viewing the totality of the circumstances surrounding Defendant's statement during the video re-enactment, we conclude that Defendant did not revoke his previous waiver of his privilege against self-incrimination. As a result, the trial court did not err in denying Defendant's motion to suppress. Point II denied.

## Point III: Prosecutor's Closing Argument

In his final point relied on, Defendant argues that the trial court plainly erred in permitting the prosecutor's comments about the shooting of Officer Vernon during closing argument. Defendant contends that the prosecutor's statements regarding the lack of stipling or powder burns on Officer Vernon's shirt amounted to testimonial evidence that could not be cross-examined because it was not based on evidence adduced at trial. The State responds that the prosecutor's comments were based on reasonable inferences.

Trial counsel did not object to the prosecutor's closing argument, nor did he include it in Defendant's motion for new trial, and therefore the argument is not preserved for review. Defendant requests plain error review pursuant to Rule 30.20. Plain error review mandates reversal only if the error results in manifest injustice. *State v. White*, 247 S.W.3d 557, 561 (Mo. App. E.D. 2007). In order to result in manifest injustice, the closing argument must have had a decisive effect on the jury's determination. *Id.* at 563. "Appellate courts of this state rarely grant relief on assertions of plain error as to closing argument . . . because, in the absence of an objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *Id.*

At trial, Defendant testified that he did not know that Officer Vernon was a police officer when he shot him. Defendant testified that he was hiding in a dumpster when he "saw a light." Defendant recalled that "the police officer lift[ed] the lid [of the dumpster], and [he] just shot him." Defendant also testified that when he shot, he did not know that he was shooting at a police officer. During closing argument, the prosecutor argued the following:

> And there's [Officer Vernon's] shirt. If [Defendant is] that close to him, there's going to be powder burns on the shirt. If he's that close to him, he's reaching out, he can't be six inches away from this guy, and the blast, that muzzle blast coming out of there is going to put the stipling all over his shirt, all over the two spots where the shirt - -
> You can ask for that shirt, and you have to search for the hole that was left. You can't go right to some spot because you see the stipling, the powder burns. It literally burns. When the powder comes out of the barrel, it travels for a distance still burning, and if it's that close, it's going to burn his uniform, leave marks on the uniform, on the side, on the shoulder. It just did not happen that way, and it could not have happened that way.

"The State, during closing argument, may not argue facts outside the record because such arguments amount to unsworn testimony by the prosecutor that is not subject to cross-examination." *State v. Miller*, 372 S.W.3d 455, 475 (Mo. banc 2012). It is inappropriate for the prosecutor "to express opinions implying awareness of facts not available for the jury's consideration." *Id.* However, parties are entitled to argue "reasonable inferences from the evidence." *State v. Edwards*, 116 S.W.3d 511, 537 (Mo. banc 2003). We review closing arguments in light of the entire record, not in isolation. *Id.* Here, Defendant argues that whether or not there were burn marks or stipling on Officer Vernon's shirt is a matter that could only be addressed by expert testimony, and because an expert did not testify in this regard at trial, the prosecutor's statements were not reasonable inferences from the evidence adduced at trial. Further, Defendant contends that the comments amounted to manifest injustice because the issue of whether Defendant knew Officer Vernon was a police officer was "the most critical and

9

contested issue in the case" and the statements "could easily have affected the jurors' determination of the issue."

We conclude that the statements did not have a decisive effect on the jury and therefore did not result in manifest injustice. In this case, there was ample evidence presented, aside from the prosecutor's closing argument, for the jury to determine that Defendant did, in fact, know that Officer Vernon was a police officer. Officer Vernon testified that he did not approach the dumpster, was never any closer than five feet from the dumpster, and did not look into the dumpster. Officer Vernon recalled that he was walking toward his car when Defendant "jumped out of the dumpster [and] pointed a chrome handgun at [him]." Further, Officer Vernon testified that he turned his patrol radio "as loud as it can be" when he exited his vehicle. Moreover, Defendant himself testified that he went in the dumpster "to hide." In his interview with police, Defendant said that he went to the dumpster because he was "scared," and that he was aware that the police are "every fucking where." Because there was other evidence pointing to the fact that Defendant was aware Officer Vernon was a police officer, we cannot conclude that the prosecutor's closing argument had a decisive effect on the jury.

Accordingly, the trial court did not plainly err in permitting the prosecutor's statements in closing argument. Point III denied.

**Conclusion**

The judgment of the trial court is affirmed.

_____
Philip M. Hess, Presiding Judge

Gary M. Gaertner, Jr., J. and
Angela T. Quigless, J. concur.

10