

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,            )        *Opinion issued April 2, 2019*

                          )

           Respondent,        )

                          )

v.                                )       No. SC96737

                          )

MARVIN D. RICE,             )

                          )

           Appellant.          )

## APPEAL FROM THE CIRCUIT COURT OF ST. CHARLES COUNTY
### The Honorable Kelly Parker

Marvin Rice appeals his convictions for first- and second-degree murder. The circuit court sentenced him to death for the first-degree murder of Annette Durham and to life imprisonment for the second-degree murder of Steven Strotkamp.

Rice argues the circuit court erred in refusing to submit his proposed jury instructions for second-degree murder and voluntary manslaughter for Strotkamp's murder. He contends he was entitled to the instructions because there was evidence from which a jury could find he acted out of sudden passion arising from adequate cause in the death of Strotkamp. Rice also asserts the circuit court violated his right against self-incrimination under *Miranda v. Arizona*, 384 U.S. 437 (1966), by admitting at trial statements he made during a police interrogation after he had invoked his right to silence.

He further alleges his due process rights were violated when the circuit court allowed the State to introduce evidence of his post-*Miranda* silence. In addition, Rice argues the case should be remanded for a new penalty phase because the circuit court erred in overruling his objection to the State's penalty phase closing argument in which it commented that Rice was the "13th juror." Rice asserts this impermissibly referenced his decision not to testify and consequently violated his right against self-incrimination.

As to the Strotkamp murder, the judgment is reversed, and the case is remanded because the circuit court erred when it refused to submit Rice's proposed jury instructions in that there was sufficient evidence from which the jury could find that Rice acted out of sudden passion arising from adequate cause. As to the Durham murder, the circuit court erred in admitting statements made in violation of Rice's *Miranda* rights. This error, however, was harmless beyond a reasonable doubt because it did not contribute to the verdict obtained. Similarly, although Rice's right to due process was violated when the circuit court admitted evidence of his post-*Miranda* silence, these violations were also harmless beyond a reasonable doubt.

Further, the circuit court erred when it overruled Rice's objection to the State's penalty phase closing argument because the State's remark was an impermissible reference to Rice's decision not to testify. This error requires the judgment on Durham's murder to be reversed as to the penalty phase of the trial. The case is remanded.

## Background

Rice was charged with two counts of first-degree murder for the deaths of Durham, his former girlfriend, and Strotkamp, Durham's boyfriend. Rice and Durham

2

had a son, A.R. Though there was no formal custody arrangement between Rice and Durham, Rice had primary custody of A.R., who was born while Durham was incarcerated.

Evidence adduced at trial demonstrated that, on the night of the homicides, Durham picked up A.R. from Rice. Although Durham had occasionally visited with A.R., she had yet to have an unsupervised visit. This was set to be her first. Rice informed Durham she needed to return A.R. that night, but Durham had unspoken plans to care for him for the next three days.

At some point that evening, Durham called Rice and informed him she would not be returning A.R. Enraged by this conversation, Rice grabbed his gun and two extra magazines before setting out to retrieve A.R. He stopped at an ATM and a gas station before arriving at the home of Durham's sister-in-law in search of A.R. Not finding him there, Rice drove to the home of Durham's father, again having no luck locating A.R. He then learned A.R. was at the home Strotkamp and Durham shared in Dent County and drove there.

Upon arriving, he found A.R. with the couple and Durham's six-year-old daughter, S.C. Upon hearing Rice arrive, Durham instructed S.C. to take A.R. into the bedroom and close the door. S.C. heard Durham and Rice argue about A.R from what she believed to be the front doorway. At some point, Strotkamp approached the two as well. During the exchange, Rice broke the front door down. S.C. then heard what she believed to be someone banging on the washer and dryer near the front door, but the

3

sounds were later determined to be gunshots. Rice then came into the bedroom carrying a gun and, saying nothing to S.C., he picked up A.R. and left the room.

S.C. exited the bedroom and cried out to her mother, who did not answer. She first discovered Strotkamp, who was lying in the hallway and groaning. She then found her mother's body lying on the ground outside.

S.C. ran to the nearby home of Strotkamp's parents, Carol Strotkamp and Stanley Watson. Ms. Strotkamp ran to the scene of the crime, finding Durham deceased and her son bleeding profusely. When his mother asked him what happened, Strotkamp said, "Marvin Rice." Ms. Strotkamp ran back home to call for help while Watson ran back to Strotkamp's home to stay with him until help arrived. Strotkamp again mentioned Rice's name to Watson. Strotkamp died before emergency personnel arrived.

Meanwhile, Rice dropped A.R. off with his wife and started driving toward a hospital in Columbia. A Dent County sergeant called Rice and spoke with him over the telephone, encouraging Rice to turn himself in. Rice spoke about finding a place to commit suicide and warned the sergeant that everyone must stay out of his way or he would shoot them.

En route to Columbia, Rice was involved in a high-speed chase with law enforcement officers. Police officers in Jefferson City closed down the highway and deployed spike strips in an attempt to stop Rice's speeding car. Eventually, Rice pulled into a Jefferson City hotel parking lot and entered the hotel. Engaging in a shootout with an off-duty police officer, Rice was shot, which caused him to fall to the ground. He was arrested and was taken to the hospital for treatment.

4

While Rice was being treated at the hospital, a highway patrol sergeant detective began interrogating him. The detective read Rice his *Miranda* rights, which Rice indicated he understood. After Rice made a few comments about what had happened at the hotel, Rice stated, "I'm sorry, sir, I don't wanna talk no more." After the detective confirmed Rice no longer wanted to speak, the interrogation and the recording ended.

Approximately 20 to 30 minutes later, the detective reinitiated his questioning without rereading Rice his *Miranda* rights. Rice responded to the detective's questions about Rice's history working for the Dent County sheriff's office. The interrogation then stopped so Rice could use the restroom and resumed 20 to 30 minutes later. The detective reminded Rice of his *Miranda* rights but did not reread them. Rice acknowledged he remembered and understood his rights.

The detective again attempted to question Rice about what had happened the night of the shootings. Rice stated, "I got nothing to say, sir." The detective did not stop questioning Rice, imploring Rice to cooperate because, if Rice did not give his side of the story, "somebody else [was] gonna give [him] one." Rice again indicated he did not want to be interrogated: "My heart doesn't like this. I don't wanna talk." But the detective continued questioning Rice, again asking him if he had anything else to say. After Rice mumbled a negative answer, the detective stopped the interrogation.

Within minutes, Rice voluntarily began talking to the detective again. He described his recent struggles with depression and stated he was sorry about what had happened that night. Another, longer break then occurred in the interrogation, during which doctors performed medical tests and Rice received treatment. The interrogation

5

was put on hold until the next morning.  When the detective reread Rice his *Miranda* rights and began questioning him again, Rice answered the detective's questions and explained in detail his version of the previous night's events.

Rice was charged with two counts of first-degree murder.  Before trial, Rice filed a motion to suppress the statements he made during the hospital interrogation on the basis he had invoked his right to remain silent and this invocation was not honored.  The circuit court overruled the motion after a hearing, and the evidence was admitted at trial over Rice's continuing objection.  At trial, the State also presented evidence demonstrating that, when Rice was being interrogated, he refused to answer the detective's questions. Rice objected and moved for a mistrial.  The motion was overruled.

During the instructions conference, Rice submitted two proposed jury instructions for the murder of Strotkamp.  One, Instruction D, was for second-degree murder and included language requiring a finding that Rice did *not* act out of sudden passion arising from adequate cause.  The other, Instruction E, was for voluntary manslaughter.  The State objected to both instructions, which the circuit court sustained.  After deliberations, the jury found Rice guilty of second-degree murder for the death of Strotkamp and guilty of first-degree murder for the death of Durham.

Rice did not testify at either the guilt or penalty phase of trial.  During the State's closing argument during the penalty phase, it referred to Rice as the "13th juror."

> But when you go back there and when you do this [deliberate on punishment], I hope you remember only 12 of you are going to do it, [but] there's a 13th juror in this room.  The 13th juror is sitting behind you, we often call them the defendants, but he's the 13th juror and if I'd been allowed to ask him those questions last week, he would have told us ....

6

The State's argument was interrupted by defense counsel's objection that this was an improper reference to Rice's decision not to testify. The circuit court overruled the objection after the State insisted it was referring to the *voir dire* process, not Rice's general decision not to testify. The State was permitted to continue its closing argument in the same manner.

The jury was ultimately unable to decide upon a punishment for the Durham murder but recommended a sentence of life imprisonment for the Strotkamp murder. After trial, Rice filed a motion asking the court to impose a sentence of life without parole for the Durham murder on the basis 11 jurors preferred a sentence of life. Accompanying the motion were two signed juror statements indicating the jury was "deadlocked on punishment 11 to 1 in favor of" life imprisonment.

The court sentenced Rice to death for the murder of Durham and to life imprisonment for the murder of Strotkamp. Rice appeals.[1]

## The Guilt Phase

Rice argues the circuit court erred when it refused to submit his proposed jury instructions for second-degree murder – in lieu of the second-degree murder instruction the court submitted – and voluntary manslaughter. He also argues the State violated his right against self-incrimination by continuing to question him after he had invoked his

---

[1] This Court has exclusive appellate jurisdiction under article V, section 3 of the Missouri Constitution.

7

right to silence and because the State violated his due process rights by introducing

evidence of his decision to remain silent.

## I. Instructional Error

Rice argues the circuit court committed reversible error when it refused to give his

proposed Instructions D and E for the charged homicide of Strotkamp. Proposed

Instruction D[2] mirrored MAI-CR 3d 314.04 in that it included language requiring, to

convict Rice of second-degree murder, the jury to find that Rice did *not* act out of sudden

---

[2] Instruction D provided:

> As to Count II, if you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree.

> As to Count II, if you find and believe from the evidence beyond a reasonable doubt:
> - First, that on or about the 10th day of December 2011, in the County of Dent, State of Missouri, the defendant caused the death of Steven Strotkamp by shooting him, and
> - Second, that it was the defendant's purpose to cause the death of Steven Strotkamp, and
> - Third, that defendant did not do so under the influence of sudden passion arising from adequate cause,

> then you will find the defendant guilty under Count [II] of murder in the second degree.

> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.

> As used in this instruction, the term "sudden passion" means passion directly caused by and arising out of provocation by Steven Strotkamp, or another acting with Steven Strotkamp, which passion arose at the time of the offense. The term "adequate cause" means cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control.

8

passion arising from adequate cause. Similarly, proposed Instruction E[3] tracked

MAI-CR 3d 314.08, a voluntary manslaughter instruction. He contends these instructions

should have been given because there was a basis in the evidence to acquit him of

second-degree murder and to convict him of voluntary manslaughter, which occurs when

a person "[c]auses the death of another person under circumstances that would constitute

murder in the second degree ... except that he caused the death under the influence of

sudden passion arising from adequate cause[.]" Section 565.023.1.[4] Because he timely

requested those instructions, he asserts, the circuit court was required to submit these

instructions to the jury.

---

[3] Instruction E provided:

> As to Count II, if you do not find the defendant guilty of murder in the second degree, you must consider whether he is guilty of voluntary manslaughter.
>
> As to Count II, if you find and believe from the evidence beyond a reasonable doubt:
> - First, that on or about the 10th day of December 2011, in the County of Dent, State of Missouri, the defendant caused the death of Steven Strotkamp by shooting him, and
> - Second, that it was the defendant's purpose to cause the death of Steven Strotkamp,
>
> then you will find the defendant guilty under Count II of voluntary manslaughter.
>
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of voluntary manslaughter.

[4] All statutory citations are to RSMo 2000 unless otherwise indicated.

## A. Standard of Review

This Court reviews *de novo* the circuit court's decision whether to give a requested jury instruction for a lesser-included offense. *State v. Jackson*, 433 S.W.3d 390, 395 (Mo. banc 2014). The evidence is viewed in the light most favorable to the defendant and, when in doubt, the court should instruct on the lesser-included offense. *State v. Thomas*, 161 S.W.3d 377, 380 (Mo. banc 2005). If the statutory requirements for giving a requested jury instruction are met, "a failure to give a requested instruction is reversible error." *Jackson*, 433 S.W.3d at 395. When a court fails to give a lesser-included offense instruction, prejudice is presumed. *Id.* at 395 n.4.

## B. Preservation

The State argues much of Rice's argument is unpreserved for appeal because, at the instructions conference, the defense attorneys "did not argue that sudden passion from adequate cause resulted from the confrontation at [the victims'] home" and only argued that sudden passion could have arisen from Durham informing Rice he may never see A.R. again. According to the State, Rice changed his theory of sudden passion on appeal and his argument warrants only plain error review.

"[A] point is preserved for appellate review only if it is based on the same theory presented at trial." *State v. Johnson*, 207 S.W.3d 24, 43 (Mo. banc 2006). "An appellant cannot broaden the scope of his objections on appeal beyond that made in the trial court." *Id.* At the instructions conference, although Rice did primarily focus on the evidence demonstrating what Durham had said to Rice before their confrontation, he also argued a voluntary manslaughter instruction should be given because "there [was] evidence that

10

the jury could believe or disbelieve that once he got to that house, that he was attacked." In Rice's motion for new trial, he highlighted the evidence that when Rice arrived at the Strotkamp residence, "he was met with violence from Annette Durham and Steven Strotkamp" and Rice's additional statement that "he believed Steven Strotkamp was reaching for a weapon." He argued this evidence was "more than adequate to support giving defense Instruction[s D and] E."

Rice furthered the same theory during the instructions conference, in his motion for new trial, and his appellate brief: there was sufficient evidence presented at trial to support giving the proposed instructions. This argument, on all of the evidentiary bases asserted by Rice, is sufficiently preserved for review.

### C. Instruction E: Voluntary Manslaughter

Voluntary manslaughter is a lesser-included offense of both first- and second-degree murder. Section 565.025. A circuit court must instruct the jury on a lesser-included offense when (1) "a party timely requests the instruction;" (2) "there is a basis in the evidence for acquitting the defendant of the charged offense;" and (3) "there is a basis in the evidence for convicting the defendant of the lesser included offense for which the instruction is requested." *Jackson*, 433 S.W.3d at 396; section 556.046.3, RSMo Supp. 2011.

The first two requirements are satisfied here. Rice timely requested Instruction E. Further, there was a basis in the evidence to acquit Rice of the charged offense of first-degree murder because the jury is always free to disbelieve any evidence or refuse to draw any necessary inference. *Jackson*, 433 S.W.3d at 399. Rice's argument, then,

11

depends on whether there is a basis in the evidence to convict him of the lesser-included offense of voluntary manslaughter.

"Voluntary manslaughter is defined as causing the death of another person under circumstances that would constitute murder in the second degree, except that the death was caused under the influence of sudden passion arising from adequate cause." *State v. Clay*, 533 S.W.3d 710, 717 (Mo. banc 2017); section 565.023.1. To warrant a lesser-included offense instruction on voluntary manslaughter, there must be a basis in the evidence for the jury to find that Rice acted out of sudden passion arising from adequate cause. "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." Section 565.002(7). The provocation "must be of a nature calculated to inflame the passions of the ordinary, reasonable, temperate person …. [T]here must be a sudden, unexpected encounter or provocation tending to excite the passion beyond control." *State v. Fears*, 803 S.W.2d 605, 609 (Mo. banc 1991). Adequate cause, meanwhile, is "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." Section 565.002(1).

Rice argues the following evidence supports a finding of sudden passion arising from adequate cause that would require the circuit court to instruct the jury on voluntary manslaughter: (1) after Durham picked up A.R., she called Rice and informed him he would never see his son again; (2) Rice was afraid he would be "met with firearms" when he arrived at the victims' home looking for A.R.; (3) when he arrived at the victims'

12

home, Rice was again informed he would not get his son back; (4) the victims "came at" Rice and "basically assaulted" him; (5) the alleged assault came in the form of Durham grabbing Rice's left shoulder and trying to wrestle him to the ground as Strotkamp "started around the right-hand side" toward Rice; and (6) Rice could not see Strotkamp's hand and was unsure if he had a weapon.

The State argues the evidence of Durham informing Rice through the telephone that he may never see his son again is insufficient to find sudden passion arising from adequate cause because Rice had time to cool between having this conversation and committing the homicides. It is unclear from the record how much time passed between these two events, but after Rice spoke with Durham, he visited an ATM, a gas station, and two other homes before arriving at the victims' home.

Sudden passion must "arise[] at the time of the offense" and cannot be "solely the result of former provocation." Section 565.002(7). The defendant must not have had time for his passions to cool. *State v. Redmond*, 937 S.W.2d 205, 208 (Mo. banc 1996). Though there's no bright-line rule for how long of a period of time constitutes a sufficient "cooling-off period," it has been held that 10 minutes was enough time for one's passion to cool. *State v. Whitley*, 408 S.W.3d 305, 308 (Mo. App. 2013). On this evidence, the State is correct. The telephone conversation between Durham and Rice cannot legally give rise to sudden passion, as it was not sufficiently contemporaneous with the offense.

Much of the other evidence that Rice argues supports a finding of sudden passion came from Rice's own statements during his police interrogation. The State argues Rice's statements about his encounter with Durham and Strotkamp were "vague and

13

conclusory," were "not evidence," and were not "factual allegations that could support sudden passion arising from adequate cause." This Court disagrees. Testimony is evidence. This evidence may warrant instructing down so long as these statements support a finding of sudden passion arising from adequate cause. *Thomas*, 161 S.W.3d at 381.

In addition to the evidence that Durham threatened to keep A.R. away from Rice forever, Rice also presented evidence that when he arrived at the victims' home, he feared he would be met with firearms. He alleged he was once again informed he would not see his son again before he was "basically assaulted" by the victims, as Durham grabbed his shoulder and tried to wrestle him down while Strotkamp, whose hand was concealed, came around her and approached Rice.

The case of *State v. Creighton*, 52 S.W.2d 556 (Mo. 1932), is instructive. In *Creighton*, when the defendant was standing on a sidewalk, the decedent brushed against him and asked if he was "looking for trouble" before the two got into an argument. *Id.* at 559. The decedent "grabbed" the defendant by his lapel and slapped his hat off. *Id.* The defendant then pulled out his pistol and shot the decedent. *Id.* The Court stated, "It is **fundamental** that neither the trial court nor this court can pass on the weight of the evidence in a criminal case; that function belongs to the jury." *Id.* at 562 (emphasis added).

> "If there is substantial evidence of lawful provocation, the defendant is entitled to an instruction on manslaughter. **Proof of an initial assault and battery upon him by the deceased** is such evidence because it measures up to the standard exacted by the law and in point of fact **warrants an inference that heat of passion was engendered thereby**."

14

*Id.* (emphasis added). Further, in *Fears*, this Court found there was evidence from which the jury could find sudden passion when the victim called the defendant's children liars, circled around the defendant, and threw a punch at the defendant. 803 S.W.2d at 608. "The aggregate of insulting words, offensive gestures and physical contacts that occurred during this encounter was … sufficient for reasonable persons to have found that Fears acted under 'sudden passion.'" *Id.* at 609.

Rice claims he was assaulted by Durham and Strotkamp, acting together, when he arrived at their home. Sudden passion must arise out of provocation by the victim or another acting with the victim. Section 565.002(7). The State argues there is "no evidence" Strotkamp and Durham were "acting together," but there was evidence that the victims, who lived together, simultaneously approached or attacked Rice. This evidence gives rise to an inference the victims were acting together. Viewing the evidence in the light most favorable to the defendant, *Thomas*, 161 S.W.3d at 380, there is sufficient evidence of Strotkamp and Durham acting together.

Further, though much time passed between when Durham initially told Rice he would not see his son and when Rice killed the victims, she again informed him when he arrived at the home, which the jury could find reignited his anger, as the threat of not being allowed to see one's child ever again could provide adequate provocation to a parent. This provocation, combined with the alleged physical assault giving rise to an inference of sudden passion, is sufficient evidence from which a jury could find sudden passion. *Creighton*, 52 S.W.2d at 562; *see also Fears*, 803 S.W.2d at 608. Because there

15

was a basis in the evidence supporting a finding of sudden passion arising from adequate cause, Rice was entitled to an instruction on voluntary manslaughter. The trial court erred in refusing to submit Rice's Instruction E.

### D. Instruction D: Second-Degree Murder

Rice also argues the circuit court erred when it refused to submit to the jury his version of a second-degree murder instruction, Instruction D. Rice's proposed instruction mirrored the Missouri Approved Instructions in that it included language requiring the jury to find Rice had *not* acted out of sudden passion arising from adequate cause to convict him of second-degree murder. The second-degree murder instruction actually submitted to the jury omitted this language.

The additional sudden passion language requested by Rice "must be given" "[i]f there is evidence supporting sudden passion from adequate cause." MAI-CR 3d 314.04 Notes on Use 4; *see also* MAI-CR 3d 314.08 Notes on Use 3 (explaining that when there is evidence of sudden passion and adequate cause, the "instruction on voluntary manslaughter will be identical to MAI-CR 3d 314.04 [the second-degree murder instruction] as to the elements of the offense except that MAI-CR 3d 314.04 will include the paragraph on negating sudden passion arising from adequate cause"). Because there was a basis in the evidence supporting a finding of sudden passion arising from adequate cause, as set out above, the circuit court was required to submit Rice's proposed Instruction D.

16

Rice was prejudiced when the circuit court failed to give Rice's proposed Instructions D and E. *Jackson*, 433 S.W.3d at 395 n.4. The judgment as to second-degree murder for the death of Strotkamp is reversed, and the case is remanded.

## *II.* **Miranda**

As to the conviction for the first-degree murder of Durham, Rice argues the circuit court erred in overruling his motion to suppress statements he made during his police interrogation because the statements were made after he invoked his right to silence and the police failed to scrupulously honor his invocation.

### *A. Standard of Review*

"This Court reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling and defers to the trial court's determinations of credibility." *State v. Edwards*, 116 S.W.3d 511, 530 (Mo. banc 2003). The circuit court's ruling on a motion to suppress will not be reversed unless the decision was clearly erroneous. *State v. Holman*, 502 S.W.3d 621, 624 (Mo. banc 2016). A ruling is clearly erroneous if the Court is "left with a definite and firm belief a mistake has been made." *Id.*

Whether conduct violates the Fifth Amendment is a question of law and is given *de novo* review. *Id.* This Court will "indulge every reasonable presumption against waiver of fundamental constitutional rights." *State v. Bucklew*, 973 S.W.2d 83, 90 (Mo. banc 1998). "A properly preserved federal constitutional error in a criminal trial does not require reversal and remand for a new trial if the reviewing court determines the error was harmless beyond a reasonable doubt." *State v. Minner*, 256 S.W.3d 92, 96 (Mo. banc 2008).

17

*B. Analysis*

Rice argues he unequivocally invoked his right to silence several times during the police interrogation and the statements he made after he invoked that right should not have been admitted at trial. After a person receives *Miranda* warnings, "[i]f the individual indicates in any manner, *at any time prior to or during the questioning*, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74 (emphasis added). The accused's Fifth Amendment right to cease police questioning "must be scrupulously honored." *State v. Simmons*, 944 S.W.2d 165, 173 (Mo. banc 1997).

"[N]o ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination." *Emspak v. United States*, 349 U.S. 190, 194 (1955). But to invoke this right, the individual "must give 'a clear, consistent expression of a desire to remain silent.'" *Simmons*, 944 S.W.2d at 173-74 (quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989)). If the invocation is ambiguous or equivocal, the police are not required to end the interrogation and are not required to ask questions to clarify whether the accused is invoking his right to silence. *See Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). To determine whether an individual has unambiguously invoked his right to remain silent, "[t]he individual's statements are viewed in their entirety." *State v. Cannon*, 469 S.W.3d 887, 892 (Mo. App. 2015).

*1. Interrogation Part One: "I don't wanna talk no more."*

At the outset of the hospital interrogation, the detective read Rice his *Miranda* rights. Rice stated he understood his rights and had no questions. Rice began describing

18

the events that had taken place at the hotel but did not answer any questions about what had occurred at the victims' residence. Not long into the interrogation, Rice indicated he no longer wished to speak.

> DETECTIVE: Marvin, what happened before you came, before you were coming to the V.A. tonight?
>
> RICE: My mouth is so dry.
>
> DETECTIVE: Yeah. Marvin, what, what happened before you came, before you came to the V.A. tonight?
>
> RICE: I'm sorry, sir, I don't wanna talk no more.
>
> DETECTIVE: You don't wanna talk? You hurting too much?
>
> RICE: Yes.
>
> DETECTIVE: Okay, we'll give you, give you a few minutes so they can take care of you, okay.

The recording then ended. The detective resumed questioning 20 to 30 minutes later but did not reread Rice his *Miranda* warnings. As the detective questioned Rice, attempting to solicit information about the events of that night, Rice answered almost no questions substantively. After detailing his history working for the Dent County sheriff's office, he answered the detective's question why he was headed to the Columbia hospital after the homicides by stating "that was the only place [he] could think of to try and get help" and remarked that he had been having psychological problems "for a long time." Another break in the interrogation then occurred because Rice needed to use the bathroom.

After this break, which lasted another 20 to 30 minutes, the interrogation resumed once again. The detective "reminded" Rice of his *Miranda* rights, and Rice confirmed he

understood those rights and had no questions about them. The detective immediately asked again about what had happened earlier that night.

Rice argues his statement that he "[did not] wanna talk no more" was a clear and unequivocal invocation of his right to silence and that the State's continued attempts at interrogation violated his *Miranda* rights. Other states have found similar defendant statements sufficiently clear to invoke an individual's right to silence. *See Commonwealth v. Lukach*, 195 A.3d 176, 190 (Pa. 2018) ("I'm done talking. I don't have nothing to talk about" was unequivocal despite defendant prefacing statement with "I don't know"); *see also Commonwealth v. Smith*, 46 N.E.3d 984, 992 (Mass. 2016) ("I'm done talking. I don't wanna talk no more" was clear invocation of right to silence); *see also McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir. 2001) ("I don't wanna talk about it" was clear invocation).[5]

Rice's statement that he did not want to talk anymore closely tracks the statements made in these cases from other jurisdictions. It was not immediately followed by continued statements, and it was not qualified by any equivocal language. Rather, it was a clear indication Rice no longer wanted to talk.

The State argues Rice did not invoke his right to silence because his statements were made in the context of the significant pain he was experiencing and "his willingness

---

[5] *Compare* these cases *with State v. Perdomo-Paz*, 471 S.W.3d 749, 758 (Mo. App. 2015) (Defendant's response that he did "not for real, man, no but …" want to answer a detective's questions was not a clear and unequivocal assertion of his right to silence) *and State v. O'Neal*, 392 S.W.3d 556, 569 (Mo. App. 2013) (Defendant's statement that he "[did not] feel like talking" was not unequivocal invocation of right to remain silent because it was immediately followed with the equivocation "but" and defendant's continued speaking).

20

to generally speak with" the detective. But Rice's pain does not make his statement any less unambiguous. Even if the pain was a motivating factor in Rice's decision to invoke his right to silence, he clearly and unequivocally stated he did not wish to talk anymore. And further, even if Rice had indicated a "willingness" to speak with police by responding to questions, the right to silence may be invoked at any time during police questioning. *Miranda*, 384 U.S. at 473-74. "The waiver of this right [to silence] may be revoked at any time, at which point a defendant's silence is again protected." *State v. Tims*, 865 S.W.2d 881, 885 (Mo. App. 1993).

The State also argues Rice continued to participate in the interrogation after the invocation, which serves as "further confirmation that no invocation in fact occurred" under *O'Neal*, 392 S.W.3d at 571. But this case differs from *O'Neal*, in which "there was no clear request to remain silent at the outset." *Id.* Indeed, the court of appeals explained it referred to the defendant's continued answers to questions "not to undermine an unambiguous invocation O'Neal had previously made, but only as further confirmation that no invocation in fact occurred." *Id.* Unlike *O'Neal*, Rice made a clear invocation of his right to remain silent, and the State cannot use later-occurring facts to inject ambiguity where none exists. *See Smith v. Illinois*, 469 U.S. 91, 91 (1984) ("[A]n accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel.").[6]

---

[6] Although Rice did answer some non-substantive questions after the first time he invoked his right to silence, he did so 20 to 30 minutes after his initial invocation and not immediately after. These later-given answers cannot be used to inject ambiguity into his original invocation.

21

Because Rice invoked his right to silence, the police had a duty to scrupulously honor that invocation. *Bucklew*, 973 S.W.2d at 88. To determine whether Rice's invocation was scrupulously honored, courts will consider five factors: (1) whether the interrogation ceased;[7] (2) whether the interrogation was resumed only after the passage of a significant period of time with new *Miranda* warnings; (3) whether the object of any subsequent interrogation was to wear down the suspect and cause him to change his mind; (4) how many subsequent interrogations were undertaken; and (5) whether subsequent questioning involved the same crime. *Id.* at 89 (citing *Michigan v. Mosley*, 423 U.S. 96 (1975)).

The interrogation did cease – briefly – after Rice stated he did not want to talk anymore. But not more than 20 to 30 minutes later, the detective resumed questioning Rice without new *Miranda* warnings and continued to ask questions about the same crime. A mere 30 minutes is not passage of a "significant period of time" in which to take a break from interrogation. *See O'Neal*, 392 S.W.3d at 567 (citing cases for the proposition that "intervals of one-to-four hours between interrogations are consistent with the police's duty to 'scrupulously honor' a suspect's invocation"). And though Rice was "reminded" of his *Miranda* rights, he was not reread them. Although *Miranda* warnings "do not constitute a ritualistic formula which must be repeated verbatim, ... the whole substance of the warning, and not merely part of it, must be given." *State v. Neal*, 476 S.W.2d 547, 555 (Mo. banc 1972). Rice's invocation was not scrupulously honored here.

---

[7] When an accused invokes his right to silence, "the interrogation **must** cease." *Miranda*, 384 U.S. at 473-74 (emphasis added).

For this reason, the admission of any statements made after Rice's invocation – including his statements about wanting to get help at the Columbia hospital and having had psychological problems for a long time – violated Rice's *Miranda* rights.

    *2. Interrogation Part Two: "I got nothing to say," "I don't wanna talk."*

As stated above, the detective began questioning Rice after his bathroom break and after "reminding" Rice of his *Miranda* rights. Rice stated he understood his rights and had no questions about them before the following exchange occurred:

> DETECTIVE: ... Earlier before, down in the emergency room you, I asked you what happened and you told me about coming into Jeff City and you remember seeing the lights and uh, uh, getting shot [and] whatnot and you said you were on your way to the V.A. where you had been treated for some psychiatric problems. Do you remember telling me that?
>
> RICE: Mm hmm. [Yes.]
>
> DETECTIVE: Okay. What I need for you to tell me about here, you know the reason this whole thing started. What happened tonight at [the victims' home] that kind of kicked this whole thing off? I need you to be honest with me.
>
> RICE: I got nothing to say, sir.
>
> DETECTIVE: Okay, you got nothing to say about at [Strotkamp's] or ... obviously you're upset with what happened down there with, with [Durham] but I want you to understand being, being a cop. You're a cop and I'm a cop. I'm not gonna play games with you. ... I'm not gonna jerk you around, but you understand, you know, we got folks down there that worked [the crime]. We got, you know, a seven-year-old who saw what occurred. I'd like to be able to give your side of the story because as you know ... if you don't have a voice in this somebody else is gonna give you one and that voice probably isn't gonna say what you want it to say .... It's not gonna give your side of the story as far as what led up to this .... You understand where I'm coming from, Marvin?
>
> RICE: Mm hmm. [Yes.]

23

DETECTIVE: I mean if, if you don't give some kind of reason as to why, people are gonna assume the worst in you, and especially coming from law enforcement, you know we, we sure don't need people to say that you're some, some lunatic crazy cop who had this all planned out and went on a shooting spree intending to hurt all these people …. I can't put words in your mouth.  I need to hear from your side of the story as far as what happened.

RICE: My heart doesn't like this.  I don't wanna talk.

DETECTIVE: Okay, I understand that.  Can you tell me anything about what happened before I go?

RICE: Mm mmm. [No.]

DETECTIVE: Okay.  Will you visit with me here in a little bit when they get your pain under control?  I mean, can you tell me something about …

RICE: We'll see.

DETECTIVE: … why this happened with [Durham]?

RICE: If they actually get my pain under control, we'll see.

DETECTIVE: Alright, we'll give you some time and try to get your pain under control, alright.  I'm gonna go ahead and turn off the recorder.

Rice made two statements purportedly invoking his right to silence: "I got nothing to say" and "I don't wanna talk."   Even if Rice's first statement was ambiguous, any ambiguity disappeared when, almost immediately thereafter, Rice *again* stated he did not want to talk.  This statement – which mirrors his first invocation of his right to silence – was a clear invocation of his right to silence.  And when the detective *continued* to prod Rice and again asked if he had anything to say before the detective left, Rice answered no.[8]

---

[8] To the extent the State argues Rice continued to participate in the interrogation after this invocation, he did not do so.  After Rice's last refusal to answer questions, the detective asked,

24

The State did not immediately cease its interrogation, which alone is sufficient to determine Rice's invocation was not scrupulously honored. *Miranda*, 384 U.S. at 473-74. And not only did the questioning persist, the questions were arguably intended to wear down Rice and cause him to change his mind about participating in the interrogation, as the detective made numerous emotional appeals to Rice:

> You're a cop and I'm a cop. I'm not gonna play games with you. ... I'm not gonna jerk you around.... We got, you know, a seven-year-old who saw what occurred. I'd like to be able to give your side of the story because as you know if you don't have, if you don't have a voice in this somebody else is gonna give you one and that voice probably isn't gonna say what you want it to say.

This line of questioning is clearly designed to elicit a response from Rice, mentioning that a seven-year-old witnessed the crimes and encouraging Rice to answer the detective's questions because if Rice did not have a voice in the matter, someone else was "gonna give [him] one." But it was not until Rice *again* invoked his right to silence that his invocation was taken seriously. After Rice's second invocation, his invocation was basically honored (after the detective asked again about future questioning), but the State did *not* scrupulously honor Rice's first invocation of his right to silence, which violated his *Miranda* rights. Importantly, though, Rice made no substantive statements during this portion of the interrogation – he mainly answered in affirmatives and negatives – and the State received no evidentiary benefit from its violation of Rice's *Miranda* rights.

---

"Okay. Will you visit me with here in a little bit when you get your pain under control?" This statement indicates the detective had – finally – agreed to end the interrogation and had shifted toward obtaining a commitment from Rice to be questioned later. Rice never agreed, stating, "we'll see," which further indicates Rice was unwilling to participate in the interrogation. These statements cannot be considered Rice's continued participation in the interrogation.

25

*3. Interrogation Part Three: Rice's waiver and rereading* Miranda *warnings*

Shortly after Rice's second and final invocation of his right to silence, Rice reinitiated conversation with police and made several statements he contends were confessional in nature. For example, he stated he had been depressed for some time and apologized for putting the police "in the position [he] put [them] in" that night. The interrogation then stopped for an unknown period of time, but the break lasted at least until the next morning. (Tr. 53). When it resumed later that morning, Rice was reread his *Miranda* rights. He then made the bulk of the statements admitted at trial about the night of the homicides, describing in detail what had happened before, during, and after his time at the victims' home.

This third part of the interrogation did not violate Rice's *Miranda* rights. Rice's first statements regarding his mental state and his apologies were made only after he reinitiated conversation with the police. And his statements made about what happened on the night of the homicides were made only after he was reread his *Miranda* rights. At no point after he was reread his rights did he attempt to invoke his right to silence again. There was no *Miranda* violation here.

*4. The* Miranda *violations were harmless beyond a reasonable doubt*

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *State v. Ramirez*, 447 S.W.3d 792, 797 (Mo. App. 2014). The harmless error standard "recognizes the relative harm improper evidence may inject depending on its strength, its relevance, and the presence of other evidence of guilt." *Id.* "The State must prove

26

beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* The State does not need to prove the evidence had no possible effect on the jury, as this would be "tantamount to requiring automatic reversal of a conviction." *Id.*

Here, if the wrongly admitted evidence had been suppressed, the verdict would have remained the same. The statements Rice made in violation of his *Miranda* rights were that he went to the Columbia hospital to get help and that he had been having psychological problems for some time. But these statements are duplicative of other statements Rice made later in the interrogation after he had waived his *Miranda* right to silence. It was not until later in the interrogation, after Rice had either voluntarily initiated conversation with the police or had been reread his *Miranda* rights, that Rice made "confessional" statements. The statements admitted in violation of *Miranda* had little evidentiary value and, given the abundance of evidence of guilt, did not bear heavily on the determination of his guilt. Accordingly, the *Miranda* violations were harmless beyond a reasonable doubt. Rice is not entitled to relief on this ground.

### *III.* Doyle

In addition, Rice argues his conviction for first-degree murder should be overturned because his due process rights were violated when the State repeatedly referenced his decision to stay silent during police interrogations. The Fifth Amendment provides, "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Doyle v. Ohio*, the United States Supreme Court stated it was a violation of a defendant's due process rights to allow his or her post-

27

*Miranda* silence to be used to impeach the defendant at trial. 426 U.S. 610, 618 (1976). "Breaching the implied assurances of the *Miranda* warning is an affront to the fundamental fairness required by the Due Process Clause." *State v. Brooks*, 304 S.W.3d 130, 133 (Mo. banc 2010). "The holding in *Doyle* rests on the view that it is fundamentally unfair to implicitly assure a person his silence will not be used against him and then breach that promise by using that silence against him." *Id.* As such, "post-*Miranda* silence cannot be used as evidence to incriminate a defendant." *Id.*

### A. Standard of Review

*Doyle* violations are reviewed to determine whether they are harmless beyond a reasonable doubt. *Brooks*, 304 S.W.3d at 137. The State bears the burden of demonstrating "no reasonable doubt exists that the admitted evidence failed to contribute to the jury's verdict." *Id.*

### B. Preservation

To preserve a *Doyle* violation for appellate review, the defendant must have objected to the violation at trial. *Id.* at 136. But this Court has discretion to review all *Doyle* errors – preserved and unpreserved – in the context of the entire record to evaluate whether the violations were harmless beyond a reasonable doubt. *Id.* at 137.

Rice points to several instances at trial he argues were *Doyle* violations. First, a recording of Rice's hospital interrogation was played for the jury. The recording included select parts of the detective's questioning of Rice the night of the murders and through the next morning, including portions in which Rice refused to answer the detective's questions. Though Rice filed a motion to suppress this evidence, it was not

28

based on the theory that the evidence wrongly commented on his right to silence. Rather, he argued the statements he made were not voluntary and he was not properly informed of his rights. Accordingly, this argument is not preserved for appeal. *Johnson*, 207 S.W.3d at 43.

After playing the taped interview for the jury, the State examined the interrogating detective about his conversation with Rice. Rice argues this testimony describing his interrogation contained inadmissible evidence.

> THE STATE: And did you ask him several times about what happened down in Dent County at his home in regard to [Durham]?
>
> DETECTIVE: Yes, I did.
>
> THE STATE: And did he answer any of those questions?
>
> DETECTIVE: No, he did not.
>
> THE STATE: Judge, could I begin the tape again?

Rice then objected and moved for a mistrial on the basis this line of questioning violated his Fifth Amendment right to silence. Typically, an objection made after a question has been asked and answered is untimely. *State v. Blurton*, 484 S.W.3d 758, 774 (Mo. banc 2016). Exceptions to this rule exist "if the witness answers so quickly that it is impossible to object or if the grounds for objection become apparent only when the answer is given." *Id.*

When the State asked the detective if Rice had answered questions when he was interrogated at the hospital, the grounds for any potential objection from Rice were evident. Rice failed to object at that time. Even if the detective's answer was made too

29

quickly for Rice to immediately object, Rice's objection was not made until after the State continued questioning by seeking the court's permission to resume playing the recording. Because Rice's objection was not timely made, it was not preserved for appeal. *See id.*

Further, Rice failed to ask for a curative instruction. In fact, defense counsel stated she did not believe there was any curative instruction that could have been given, as it would "only draw more attention to the fact ... that [Rice] did not answer questions regarding Dent County and the implication being that he is guilty." The objection and the motion for mistrial were overruled.

Later in the direct examination, the State once again solicited testimony about Rice's silence:

> THE STATE: And just prior to the end of that or to that break, you brought up again what happened to [Durham], correct?
>
> DETECTIVE: I did.
>
> THE STATE: And his reaction was what?

Over Rice's overruled objection, the detective continued:

> DETECTIVE: He appeared to have more pain at that point and began groaning is what happened.
>
> THE STATE: Well, let me ask you this. When you brought up [Durham] and down there and asked him about that, did his demeanor change?
>
> DETECITVE: To me, every, you know, when I brought up [Durham] and asked him about what happened last night, as you heard, it seemed that his pain increased and he began moaning more and complaining.
>
> THE STATE: Does that sort of happen later on in these interviews?

30

DETECTIVE: It does consistently throughout the interview.

Though the detective did not expressly state Rice was silent during this line of interrogation questioning, he implied Rice refused to answer questions about Durham, perhaps by feigning pain and discomfort. These questions posed by the State were comments about Rice's post-*Miranda* silence. This issue was included in Rice's motion for new trial and is preserved for this Court's review.

The State urges this Court to deny even plain error review of Rice's unpreserved arguments, as Rice did not ask for plain error review. "This Court always has the discretion to engage in plain error review of issues concerning substantial rights, especially constitutional rights such as the one at issue here." *Brooks*, 304 S.W.3d at 136 n.2. Each of these errors, preserved and unpreserved, will be considered "for purposes of determining whether the State has met its burden to show that these constitutional violations were harmless beyond a reasonable doubt." *Id.*

### C. Analysis

The Court considers four factors in evaluating the effect of a *Doyle* violation on a jury's verdict: "(1) whether the government made repeated *Doyle* violations; (2) whether the trial court made any curative effort; (3) whether the defendant's exculpatory evidence is transparently frivolous; and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming." *Id.* at 137.

The State made at least three *Doyle* violations. It played a taped interview for the jury referencing Rice's silence, both through the detective's comments and Rice's assertions that he did not want to speak any longer, and twice referenced Rice's silence

31

during the detective's trial testimony. "[S]ilence does not mean only muteness; it includes the statement of a desire to remain silent[.]" *Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13 (1986). Though Rice's silence was not a substantial part of the State's case-in-chief, *any* reference to Rice's post-*Miranda* silence is improper and an unlawful *Doyle* violation.

Rice argues the fact that the circuit court took no curative efforts cuts in favor of this Court finding the impermissible *Doyle* testimony had an effect on the jury's verdict. But Rice specifically requested that no curative instruction be given to the jury, believing such an instruction to be futile. Instead, he moved immediately for a mistrial. "Under most circumstances, a trial court acts within its discretion and cures error in the admission of evidence by withdrawing the improper evidence and instructing the jury to disregard it, rather than declaring a mistrial." *State v. Carter*, 71 S.W.3d 267, 271 (Mo. App. 2002). "[T]he fact that the defendant sought no relief other than a mistrial cannot aid him." *Id.* In a case such as this, where the *Doyle* violations had little impact on the State's case, a curative instruction would have been sufficient to cure any evidentiary defects. Rice cannot benefit from the circuit court not taking curative efforts when he expressly stated he did not want the court to do so.

As far as the remaining two factors go, Rice's exculpatory evidence was not transparently frivolous, as he primarily presented evidence he did not act with knowing deliberation for the purpose of mitigating his mental state. But the evidence of guilt presented in this case, which Rice concedes was "substantial," was otherwise overwhelming. "Overwhelming evidence of guilt" means there is, at a minimum,

32

"sufficient evidence to support a conviction without consideration of the inadmissible evidence, in this case the inadmissible references to [the defendant's] silence." *State v. Dexter*, 954 S.W.2d 332, 342 (Mo. banc 1997). Indeed, the evidence of Rice's silence or refusal to answer questions had little inculpatory value in the context of the evidence as a whole, and this impermissible evidence played such a minor role in the State's case-in-chief that the other evidence of guilt would have been sufficient to support a conviction without any of the inadmissible evidence.

Balancing these four factors, the *Doyle* violations were harmless beyond a reasonable doubt. Rice is not entitled to a reversal of his first-degree murder conviction on this ground.

### The Penalty Phase

Finally, Rice argues he is entitled to a new penalty phase with respect to the Durham murder because, during the State's closing arguments, it impermissibly drew attention to his decision not to testify at trial in violation of his constitutional rights. Specifically, he argues the State wrongly commented to the jury about his decision not to testify at trial, violating his right against self-incrimination. In its closing argument, the State commented:

> But when you go back there and when you do this [deliberate on punishment], I hope you remember only 12 of you are going to do it, [but] there's a 13th juror in this room. The 13th juror is sitting behind you, we often call them the defendants, but he's the 13th juror and if I'd been allowed to ask him those questions last week, he would have told us ....

Rice objected on the grounds that this was commenting on his right not to testify, noting the State had also mentioned at least three times that Rice had not apologized for the

33

homicides. Rice argued this was not an argument but a running theme designed to bring attention to Rice's decision not to testify. The objection was overruled.

*A. Standard of Review*

This Court reviews a circuit court's rulings during closing arguments for an abuse of discretion. *State v. Forrest*, 183 S.W.3d 218, 226 (Mo. banc 2006). This Court will find an abuse of discretion if the circuit court's ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. *State v. Clark*, 364 S.W.3d 540, 544 (Mo. banc 2012).

*B. Analysis*

"The Fifth Amendment to the United States Constitution [and] article I, section 19 of the Missouri Constitution … grant criminal defendants the right not to testify and forbid comments by others on the exercise of that right." *Neff*, 978 S.W.2d at 344. A comment on a defendant's decision not to testify can be either direct or indirect. A direct reference occurs when the prosecutor uses explicit, plain references – such as the words "defendant," "accused," "testify," or their equivalent. *Id.* On the other hand, an indirect reference is "one reasonably apt to direct the jury's attention to the defendant's failure to testify." *Id.*

When examining whether an improper reference to the defendant's right to remain silent has a prejudicial effect, an appellate court must "consider the comment in the context in which it appears." *Id.* at 345. "The prejudicial impact of such a statement is a matter within the sound discretion of the trial court and a prompt instruction by the trial court to the jury to disregard the comment may cure any error in a particular case." *Id.*

34

But "[w]here an objection is made and overruled, a direct reference to the failure of the defendant to testify will almost invariably require reversal of the conviction. *Id.* at 344. "[A]n indirect reference requires reversal only if there is a calculated intent to magnify that decision so as to call it to the jury's attention." *Id*.

A prosecutor vocalizing his desire to question a defendant who had declined to testify at trial has been found to be an impermissible comment about the defendant's right against self-incrimination. *State v. Nelson*, 719 S.W.2d 13, 17 (Mo. App. 1986) (Prosecutor's closing argument was an impermissible reference to defendant's right not to testify when prosecutor stated, "we want to ask you, [Defendant], we want to ask you what you were doing with these guys"). The same type of comment occurred here. The State referred directly to Rice ("The 13th juror is sitting behind you, we often call them the defendants") and referenced the State's inability to question him ("if I'd been allowed to ask him those questions last week …"). This language is the functional equivalent of using the words "defendant," "accused," and "testify," and it was an impermissible comment about Rice's refusal to testify.

The State argues this was a mere rhetorical device and, considered in its full context, the circuit court understood the comment to refer to the State's inability to question Rice during *voir dire*, not to Rice's failure to testify during the trial. But the relevant inquiry is not how the court interpreted the comment. Rather, this Court must focus on how the jury interpreted the comment and whether the comment invited the *jury* to consider the defendant's failure to testify.

To expect the jury to infer from the closing argument that the State was referring to its inability to question Rice during *voir dire* is a bit far-fetched. A defendant is never questioned during *voir dire*, and a defendant may never sit on the jury in his own criminal trial. For the State to argue that it wanted to know the answers it would receive "if [it] had been allowed to ask [Rice] those questions …" is disingenuous, as the State is well aware it has never been, and will never be, "allowed" to question the defendant during *voir dire*. The State's comment drew attention to the fact that the jury had not heard from Rice during the trial, which was in part because he had declined to testify.

If the State intended to draw an inference that Rice must be a proponent of the death penalty because he had committed these homicides, it could have explicitly drawn that inference. Instead, the State referenced Rice's silence and focused on what Rice *did not say*. This was an impermissible comment about Rice's decision not to testify and a violation of his right against self-incrimination.

The circuit court abused its discretion when it overruled Rice's objection to the State's closing argument. For this reason, a new sentencing trial is warranted for the first-degree murder conviction of Durham. *Neff*, 978 S.W.2d at 347.

## Conclusion

The circuit court erred in refusing to submit Rice's proposed jury instructions, and for this reason, the judgment for the second-degree murder of Strotkamp is reversed. Further, because the circuit court erred when it overruled Rice's objection to the State's penalty phase closing argument, the judgment for the first-degree murder of Durham is

36

reversed with respect to the penalty phase of the trial.  In all other respects, the judgment is affirmed. [9]  The case is remanded.

_____
Mary R. Russell, Judge

All concur.

---

[9] Having found Rice is entitled to a new trial as to the murder of Strotkamp and a new penalty phase as to the murder of Durham, this Court need not address Rice's other arguments.