

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION FIVE</u>

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED110472 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| v. | ) | Cause No. 16SL-CR05375-01 |
| | ) | |
| JOHN M. HAMM, | ) | Honorable Richard M. Stewart |
| | ) | |
| Appellant. | ) | Filed: August 8, 2023 |

## I. Introduction

John Hamm appeals the judgment entered after a jury verdict convicting him of two counts of murder in the first degree and associated armed criminal action counts. Hamm does not deny that he caused the victims' deaths, but claims on appeal that the circuit court erred in failing to instruct the jury that Hamm could be found guilty of the lesser offense of voluntary manslaughter if it found he acted out of sudden passion. Hamm also claims that the circuit court made an erroneous evidentiary ruling and a sentencing error. We affirm.

## II. Background

Hamm and his fiancée, Susan Brockman, lived with Robert Hall and his girlfriend Shannon LaRock at a house in St. Louis County. In July of 2016, LaRock lost her job and could not make the rent payment. She asked Brockman if she would put in a little more money for rent, and Brockman agreed. At that time, Brockman was eight and half months pregnant with Hamm's child.

Hamm was working side jobs with a neighbor. He had saved about $250 in cash so that he and Brockman could attend a family reunion.

When Hamm returned home from work on July 12, 2016, LaRock and Hall were starting to eat their dinner in the living room.[1] Hamm saw his wallet, which had been missing for two weeks, sitting on the coffee table. LaRock and Hall told Hamm that they were "hanging onto" his wallet to make sure they could cover the rent and that they were also going to need the cash he earned at work that day or they were going to ask Brockman and him to move out. That "kind of pissed" Hamm off. Hamm claimed that LaRock said "that's just the way it is, and got up and walked into the kitchen" and then Hall "got up and walked in the kitchen" and "said, 'Well, I guess that makes me man of the house now.'" At that point, Hamm said, he let the dogs out the back door—which would have required him to walk past LaRock and Hall in the kitchen—and then "snapped." He does not remember what happened, but the next thing he knew there was blood everywhere.

According to the autopsy and police investigation, Hamm stabbed Hall thirty-two times with a knife from a block on the kitchen counter and fractured Hall's skull repeatedly with a hammer from a nearby toolbox. Hall would have been alive while being stabbed numerous times in the back and chest; it was the hammer blows to his head that killed him. Hamm also attacked LaRock with a knife and hit her in the head. She tried to defend herself, but the six stabs to her neck and chest killed her. It would have taken several minutes to inflict this number of wounds. Hamm then locked the dogs in a bedroom, stole Hall's car, and fled.

Cell phone records indicate the murder occurred between approximately 6:00 and 8:00 p.m. According to those records, by 8:30 p.m., Hamm had left the house; he made a stop and then

---

[1] The facts in this paragraph come from statements that Hamm made in two recorded jail calls with his sister in the days following his arrest. He did not testify at trial.

began traveling southwest on Interstate 44 at a little before 10 p.m. At midnight, Brockman called Hamm to tell him she was leaving work, and Hamm told her not to go home. When she asked why, Hamm said he "f***ed up" and LaRock and Hall "are dead." In that phone call, Brockman said Hamm mentioned finding LaRock with his wallet and that LaRock asked for the money he had been paid that day and threatened to kick them out. Brockman went to her mother's house, and they contacted the police. Hamm was arrested two days later at a motel in Branson, Missouri, with Hall's car. Inside the car, police found rags and a 25-gallon bucket of cleaning agent.

After the close of evidence, the circuit court instructed the jury on first-degree murder, second-degree murder, and involuntary manslaughter. Hamm requested instructions for second-degree murder without sudden passion and voluntary manslaughter, but the circuit court rejected these instructions.

The closing arguments focused heavily on whether the State had proven the deliberation element of first-degree murder beyond a reasonable doubt. The prosecutor pointed to the evidence that Hamm had time to coolly reflect on these killings when he walked past the victims in the kitchen to let the dogs out, when he decided to take a knife out of the butcher block and the hammer out of the toolbox, between each stab with the knife and each blow of the hammer, and when he switched between the weapons. The prosecutor also relied on evidence that Hamm fled the scene and that he attempted to clean up and cover his involvement, claiming this conduct was consistent with a deliberate killing.

Defense counsel argued that the State had not proven deliberation because the evidence showed that this was a crime of "passion and rage." Hamm was "provoked" when he learned that LaRock and Hall had stolen his wallet, then threatened to kick him out, "belittled" and "mocked" him, and then walked away. Defense counsel argued that Hamm "got hot and never cooled down."

3

Rather than cool and deliberate, Hamm's actions were "impulsive, hotheaded, and completely irrational" and, defense counsel argued, he could not be found guilty of murder in the first degree.

The jury disagreed. After less than two hours of deliberation, the jury found Hamm guilty on both counts of murder in the first degree and the two associated armed criminal action counts. The circuit court sentenced Hamm to life in prison without the possibility of parole for the murders and life imprisonment for the armed criminal action counts, all to be served consecutively to each other.[2]

### III. Discussion

Hamm raises nine points on appeal. In the first four, he contends that the circuit court erred by refusing to instruct the jury regarding sudden passion. In the fifth, sixth, and seventh points, Hamm argues the circuit court abused its discretion by admitting Hamm's cell phone records into evidence, as well as evidence regarding the geographic location of the phone derived from those records. In the remaining points, Hamm seeks plain error review of the life sentences he received on the armed criminal action counts.

### *Sudden Passion Instructions*

Hamm contends the circuit court erred by rejecting his proposed version of the second-degree murder instruction and the corresponding voluntary manslaughter instruction because, construed favorably to him, the evidence supported a conclusion that he acted out of sudden passion arising from adequate cause.

As submitted to the jury, none of the instructions addressed sudden passion. The first-degree murder instruction, based on MAI-CR 314.02, instructed the jury that, to find Hamm guilty,

---

[2] Hamm was also convicted and sentenced to fifteen years in prison for stealing Hall's car, but there are no issues on appeal relating to that offense.

they needed to determine that he knowingly caused the deaths of the victims after deliberation, which required "a cool reflection upon the matter for any length of time no matter how brief."[3] The second-degree murder instruction, based on MAI-CR 314.04, instructed the jury that, to find Hamm guilty, they needed to determine that Hamm knowingly caused the death of the victims, but omitted the requirement of deliberation.[4] And the involuntary manslaughter instruction, based on MAI-CR 314.10, instructed the jury that, to find Hamm guilty, they needed to determine that he recklessly caused the deaths of the victims by engaging in conduct he knew was practically certain to cause the victims' deaths.[5]

---

[3] The first-degree murder instruction regarding LaRock stated:

> As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
> First, that on or about July 12, 2006, in the County of St. Louis, State of Missouri, the defendant caused the death of Shannon LaRock by stabbing her, and
> Second, that defendant knew or was aware that his conduct was practically certain to cause the death of Shannon LaRock, and
> Third, that defendant did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,
> then you will find the defendant guilty under Count I of murder in the first degree.
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the first degree.

The same instruction was given as to Hall, except that the jury had to find his death was caused "by stabbing him and striking him with a hard object[.]"

[4] The second-degree murder instruction as to LaRock stated:

> As to Count I, if you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree.
> As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
> First, that on or about July 12, 2006, in the County of St. Louis, State of Missouri, the defendant caused the death of Shannon LaRock by stabbing her, and
> Second, that defendant knew or was aware that his conduct was practically certain to cause the death of Shannon LaRock,
> then you will find the defendant guilty under Count I of murder in the second degree.
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.

The same instruction was given as to Hall, except that the jury had to find his death was caused "by stabbing him and striking him with a hard object[.]"

[5] The involuntary manslaughter instruction as to LaRock stated:

> As to Count I, if you do not find the defendant guilty of murder in the second degree, you must consider whether he is guilty of involuntary manslaughter in the first degree.

5

The instructions that Hamm submitted would have put the question of whether Hamm killed the victims under the influence of sudden passion to the jury. Hamm's proposed second degree murder instruction, based on MAI-CR 314.04, added the requirement that the jury find that Hamm was not under the influence of sudden passion when he killed the victims.[6] Hamm's proposed voluntary manslaughter instruction, which was based on MAI-CR 314.08, would have allowed the jury to convict Hamm of voluntary manslaughter if, the jury found that that Hamm

---

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about July 12, 2006, in the County of St. Louis, State of Missouri, the defendant caused the death of Shannon LaRock by stabbing her, and

Second, that defendant recklessly caused the death of Shannon LaRock,

then you will find the defendant guilty under Count I of involuntary manslaughter in the first degree. However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of involuntary manslaughter in the first degree.

In determining whether the defendant recklessly caused the death of Shannon LaRock, you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk he will cause death and he consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances.

The same instruction was given as to Hall, except that the jury had to find his death was caused "by stabbing him and striking him with a hard object[.]"

[6] The proposed instruction as to LaRock stated:

As to Count I, if you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree.

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about July 12, 2006, in the County of St. Louis, State of Missouri, the defendant caused the death of Shannon LaRock by stabbing her, and

Second, that defendant knew or was aware that his conduct was practically certain to cause the death of Shannon LaRock, and

Third, that defendant did not do so under the influence of sudden passion arising from adequate cause,

then you will find the defendant guilty under Count I of murder in the second degree. However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.

As used in this instruction, the term "sudden passion" means passion directly caused by and arising out of provocation by Shannon LaRock which passion arose at the time of the offense. The term "adequate cause" means cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control.

The same instruction was proposed as to Hall, except that the jury had to find his death was caused "by stabbing him and striking him with a hard object" and that the sudden passion arose "out of provocation by Robert Hall."

was not guilty of second degree murder, but killed the victims knowing that his conduct was practically certain to cause their death.[7] Hamm argues that the evidence was sufficient for the jury to find sudden passion and the failure to give his requested instructions resulted in prejudice.

Voluntary manslaughter is a lesser included offense of both murder in the first and second degrees. *State v. Payne*, 488 S.W.3d 161, 164 (Mo. App. E.D. 2016). We review the circuit court's rejection of a request to instruct the jury on a lesser included offense *de novo*. *State v. Rice*, 573 S.W.3d 53, 63 (Mo. banc 2019). A circuit court is required to instruct the jury on a lesser included offense when a party timely requests the instruction and there is a basis in the evidence for acquitting the defendant of the charged offense and convicting the defendant of the lesser included offense. *Id.*; § 556.046.3, RSMo 2016. When the circuit court fails to give an instruction on a lesser included offense that is supported by the evidence, prejudice is presumed. *Rice*, 573 S.W.3d at 63.

Here, we need not determine whether the evidence was sufficient to warrant Hamm's requested instructions because any presumption of prejudice that would arise is rebutted. Under circumstances identical to this case, the Supreme Court in *State v. Johnson* held that the failure to give instructions for voluntary manslaughter based on sudden passion was "neither erroneous nor prejudicial" because the jury had already been instructed as to the lesser included offense of

---

[7] The proposed instruction as to LaRock stated:

> As to Count I, if you do not find the defendant guilty of murder in the second degree, you must consider whether he is guilty of voluntary manslaughter.
> As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
> First, that on or about July 12, 2006, in the County of St. Louis, State of Missouri, the defendant caused the death of Shannon LaRock by stabbing her, and
> Second, that defendant knew or was aware that his conduct was practically certain to cause the death of Shannon LaRock, and
> then you will find the defendant guilty under Count I of voluntary manslaughter.
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of voluntary manslaughter.

The same instruction was proposed as to Hall, except that the jury had to find his death was caused "by stabbing him and striking him with a hard object[.]"

second-degree murder and nevertheless found the defendant guilty of the greater offense of first-degree murder. 284 S.W.3d 561, 575-76 (Mo. banc 2009) (citing *State v. Glass*, 136 S.W.3d 496, 515 (Mo. banc 2004)).

The Supreme Court has since clarified that, despite *Johnson*'s references to a lack of error, the primary import of *Johnson* is that the failure to give a sudden passion instruction did not prejudice the defendant because the second-degree murder without the sudden passion language on which the jury had been instructed already "tested the element" of deliberation required to find the defendant guilty of the greater offense of first-degree murder. *State v. Jensen*, 524 S.W.3d 33, 39 (Mo. banc 2017). By convicting the defendant of first-degree murder instead of the nested lesser included offense of second-degree murder, the jury in *Johnson* "necessarily and completely rejected the possibility of a conviction on any lesser homicide offense" *Id*. at 39 (internal quotation marks and citation omitted); *accord State v. Brown*, 524 S.W.3d 44, 49-50 (Mo. banc 2017); *State v. Smith*, 522 S.W.3d 221, 226 n.7 (Mo. banc 2017). Stated another way, "[t]here was no prejudice in *Johnson* because, by finding the defendant guilty of first degree murder and rejecting second degree murder, the jury had already been given an opportunity to reject the element of deliberation and did not do so." *Brown*, 524 S.W.3d at 49 (internal quotation marks and citation omitted).

This case is controlled by *Johnson.* The instructions given in both cases were identical: first-degree murder and second-degree murder. The refused instructions in both cases were identical: second-degree murder with sudden passion language and voluntary manslaughter. The jury verdicts of first-degree murder in both cases were identical. Under these circumstances, although the jury had the opportunity to reject deliberation and find Hamm guilty of the lesser offense of second-degree murder, it did not do so. As a result, the jury necessarily determined that Hamm deliberated before killing the victims, thereby rejecting the possibility that Hamm could be

guilty of any homicide less than first-degree murder, including voluntary manslaughter based on sudden passion. *See Jensen,* 524 S.W.3d at 39. Under this testing the elements approach, Hamm suffered no prejudice from the failure to give his proposed instructions.

Hamm attempts to avoid this outcome by arguing that *Johnson* is no longer good law, but the cases he relies on for this proposition actually support the continued application of *Johnson*. Hamm relies first on *State v. Jackson,* 433 S.W.3d 390 (Mo. banc 2014). In *Jackson,* the jury was instructed *only* on robbery in the first degree after the circuit court rejected the defendant's proposed instruction on the lesser included offense of robbery in the second degree. *Id*. at 392. The Supreme Court reversed the judgment, holding that when a defendant timely requests a proper instruction on a nested lesser included offense, the circuit court is obligated to submit the instruction. *Id.* at 401. But *Jackson* did not address whether *Johnson's* and *Jensen's* "testing the elements approach" to determining prejudice continued to be good law.

The Supreme Court has since made clear that the "testing the elements approach" employed in *Johnson* remains the controlling law after *Jackson*. In *Jensen*, the Court noted that the testing the elements approach was "implicit in the *Jackson* rationale." *Jensen*, 524 S.W.3d at 39. As the Court in *Jensen* explained, because there was *no* instruction on *any* lesser included offense in *Jackson*, the instructions did not test the differential element of the charged offense. *Jensen,* 524 S.W.3d at 40. Because no elements were tested in *Jackson*, rejection of the nested lesser offense instruction was necessarily prejudicial. *See id*. Contrary to Hamm's claim that *Johnson* did not survive *Jackson*, the Court in *Jensen* held "the analysis of prejudice in *Johnson* is consistent with *Jackson*[.]" *Jensen*. 524 S.W.3d at 38-39; *accord State v. Smith*, 522 S.W.3d 221, 226 n.7 (Mo. banc 2017).

Hamm next relies on *State v. Rice*, 573 S.W.3d 53 (Mo. banc 2019) to demonstrate that *Johnson* has been implicitly rejected. *Rice* is distinguishable from both *Johnson* and this case. In *Rice*, the defendant was charged with two counts of first-degree murder for killing two different people. *Id.* at 59. The jury found the defendant guilty of first-degree murder with respect to the first victim, and the defendant raised no issues on appeal regarding the instructions on that count. *Id.* at 61-62. As to the other victim, the jury was instructed on murder in the first degree and murder in the second degree without the sudden passion language, and—unlike this case and *Johnson*— the jury found the defendant guilty of the *lesser* offense of second-degree murder. *Id.* at 61.

On appeal, the defendant challenged the circuit court's rejection of his proposed instructions for second-degree murder with the sudden passion language and voluntary manslaughter relating to that other victim. *Id.* at 61. The Supreme Court held that because there was a basis in the evidence to find the defendant acted out of sudden passion arising from adequate cause, he was entitled to his requested instructions. *Id.* at 66. The Court then stated that the defendant was prejudiced by the circuit court's failure to give those instructions, citing to *Jackson*'s footnote regarding the presumption of prejudice, but without further explanation. *Id.* (citing *Jackson*, 433 S.W.3d at 395 n.4).

The outcome in *Rice* is logical under the testing the elements approach outlined in *Johnson* and *Jensen*. Unlike in *Johnson* and unlike here, the jury in *Rice* found that the appellant had not deliberated prior to killing the victim. As a result, the issue of sudden passion remained undecided. Because that issue had never been submitted to the jury, the defendant in *Rice* was necessarily prejudiced because an element of the lesser included offense remained untested. Here, by contrast, the jury found that Hamm deliberated before killing his roommates. In so finding, the jury was required by the instructions to determine that Hamm committed the murders following "a cool

reflection upon the matter for any length of time no matter how brief." This finding is antithetical to a finding that Hamm committed the murders under the influence of sudden passion, and therefore, this element was fully tested by the instructions given. *Johnson* is controlling, and we are "constitutionally bound to follow" it. *State v. Naylor*, 505 S.W.3d 290, 298 (Mo. App. W.D. 2016).

Points I, II, III, and IV are denied.

### *Evidence of Cell Phone Records*

Hamm argues the circuit court erred by admitting Exhibit 171, a disk containing cell phone records associated with Hamm's phone number, and Exhibit 172, a disk containing an analysis of the geographic location of the phone based on those records.[8] Hamm contends that the State did not lay a proper foundation for the admission of the cell phone records because they were not authenticated. Hamm also claims that the records contain hearsay and are not admissible under the business records exception to the hearsay rule. He further argues that their admission violated his rights under the Confrontation Clause of the United States and Missouri Constitutions. Finally, because Exhibit 172 was based on an analysis of the inadmissible records in Exhibit 171, Hamm contends it is inadmissible for the same reasons.

The circuit court enjoys "considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." *State v. Mills*, 623 S.W.3d 717, 730 (Mo. App. E.D. 2021) (internal quotation marks and citations omitted). We will only find an abuse of that discretion "when the ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks

---

[8] This claim of error also applies to the admission of Exhibits 171A-C and 172A, which are hard copies of certain files on these disks.

11

the sense of justice and indicates a lack of careful deliberate consideration." *Id*. Whether Hamm's constitutional rights to confront witnesses were violated, however, is a question of law that we review *de novo*. *State v. March*, 216 S.W.3d 663, 664–65 (Mo. banc 2007).

Detective Seriff Sadikovic testified at trial that, on July 13, 2016, he requested cell phone records for Hamm's phone from Sprint by filling out a form. He also spoke on the phone with Shannon Floyd at Sprint that same day. The detective testified that he received files in electronic format via an email from Floyd later that night in response to his request. He identified Exhibit 171 as the disk onto which he downloaded these files. Detective Sadikovic viewed the files on Exhibit 171 at trial and said they were "the exact same" files that he received from Sprint. He testified that he made no alterations, additions, or deletions to the files before downloading them onto the disk.

Exhibit 171 contains nine files: a cover letter on Sprint letterhead from Floyd to Detective Sadikovic indicating the Sprint case reference number assigned to this request and stating that she is "enclosing the requested information for the specific time period associated with the following number" and then listing Hamm's phone number; a screenshot of a computer screen showing that a search for one of the categories of requested information returned no results; five spreadsheets containing data from Hamm's cell phone, including information about incoming and outgoing calls and texts and which cell phone towers that handled those calls; and two "keys" for understanding the spreadsheets.

By the time of trial in 2022, Sprint had merged with T-Mobile. Hillary Rapson was an analyst for Sprint in 2016, and at the time of trial was the custodian of records for T-Mobile. Rapson testified that she was familiar with the manner in which Sprint maintained cell phone records in 2016. She testified that, at or near the time of a call or text, certain data was collected

12

automatically by Sprint systems and stored by Sprint electronically in a database. When requested by law enforcement, a Sprint employee would "query the system" by "plugging in" the phone number and the request date range. Then "[t]he computer system automatically generates" spreadsheets from the raw data and those are forwarded to the requesting agency. This was done "routinely" "thousands of times" in response to the hundreds of requests Sprint received over the course of week. As the current custodian of records, Rapson has reviewed the computer-generated spreadsheets and the raw data and testified that the spreadsheets are reliable and "accurately reflect the raw data in a readable format[.]"

Rapson did not personally respond to Detective Sadikovic's request in this case. And in her capacity as custodian of records for what is now T-Mobile, she does not have access to the actual records that were produced on July 13, 2016. Nor is any of the raw data contained in those 2016 files still retained by the company. But Rapson was able to review the "shell" of this case, using the Sprint case reference number. On the shell, Rapson saw what was requested in this case and the titles of the records that were produced. Based on that review and her review of the contents of Exhibit 171, Rapson confirmed that each file on that disk was sent to law enforcement in 2016. She also testified that each of those records was something that was routinely produced by Sprint in response to law enforcement requests in 2016 and appeared to be in the same format. In her experience and training, Rapson said the files in Exhibit 171 appeared to be authentic records of Sprint and she had no reason to believe that they had been altered.

Hamm complains that Exhibit 171 could not be authenticated because Rapson was not personally involved in responding to Sadikovic's request in this case and had not seen the actual files that were sent to him nor the raw data contained therein. We agree that a document must be authenticated—shown that it is what it purports to be—as a foundational requirement for its

13

admission, but that authentication can be accomplished "by circumstantial evidence." *State v. Hosier*, 454 S.W.3d 883, 898–99 (Mo. banc 2015) (concluding that unsigned, undated handwritten note found in the defendant's car was authenticated by circumstantial evidence that the car had been in continuous flight from the murder scene, the note was on the same type of paper as another note written by the defendant, and the sentiment therein was consistent with other of his communications). The sufficiency of the circumstantial evidence to authenticate a document varies from case to case. *Inland USA, Inc. v. Reed Stenhouse, Inc. of Missouri*, 660 S.W.2d 727, 734 (Mo. App. E.D. 1983). The determination of authenticity is within the circuit court's discretion. *Hosier*, 454 S.W.3d at 898. Rapson's and Detective Sadikovic's testimony established circumstances from which the circuit court could find that Exhibit 171 had been sufficiently authenticated for purposes of its admission.

Rapson's testimony also demonstrates the flaw in Hamm's hearsay objection to Exhibit 171. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted therein. *State v. Reynolds*, 456 S.W.3d 101, 104 (Mo. App. W.D. 2015). Hearsay is generally inadmissible unless it falls within a recognized exception, such as for business records. *Id.* Hamm contends that the State failed to demonstrate the cell phone records were admissible under the business records exception. But records generated automatically by a computer are not hearsay because they do not contain the statement of any human declarant. *Id.* Thus, they are not subject to analysis under the hearsay rule or the business records exception. "Rather, the admissibility of the electronic data 'should be determined on the basis of the reliability and accuracy of the process' used to create and obtain the data." *Id.* (quoting *State v. Dunn*, 7 S.W.3d 427, 430–32 (Mo. App. W.D. 1999)).

In *Reynolds*, the circuit court admitted into evidence screenshots of call logs from the defendant's cell phone on the date of the crime. 456 S.W.3d at 103. On appeal, the defendant

14

argued that the screenshots were inadmissible hearsay because they did not qualify as business records. *Id*. at 104. The court disagreed. It held that the call logs were "not hearsay because they were not statements made by a human declarant." *Id*. Rather, the logs "were generated by the phone itself as the result of incoming and outgoing calls." *Id*. The police officer who had examined the phone testified extensively about the process he used to obtain the screenshots and confirmed the phone was accurately reporting the date and time; other testimony corroborated one of the missed calls on the log. *Id*. at 104-05. This testimony "establish[ed] the reliability of the logs by confirming that the data was created by the computerized operation of the phone and not by human entries." *Id*. at 105. The court concluded it was not error to admit the screenshots over the defendant's hearsay objection. *Id*. *Reynolds* relied on *Dunn* in reaching this conclusion.

In *Dunn*, the circuit court admitted into evidence a computer-generated billing record prepared by Southwestern Bell Telephone Company and billed on behalf of AT&T. 7 S.W.3d at 430. The defendant contended that this evidence was inadmissible because it was hearsay and not admissible under the business records exception. *Id*. The court of appeals rejected this contention because the records were generated by Southwestern Bell's computer and therefore were not hearsay in the first place:

> Because records of this type are not the counterpart of a statement by a human declarant, which should ideally be tested by cross-examination of that declarant, they should not be treated as hearsay, but rather their admissibility should be determined on the basis of the reliability and accuracy of the process involved.

*Id*. at 431-32 (quoting 2 MCCORMICK ON EVIDENCE, § 294 (4th ed. 1992)). Southwestern Bell's custodian of records explained that entries in the record were made instantaneously with the making of the calls and then AT&T sent Southwestern Bell the billing tapes showing when the call took place, the originating number, and the terminating number. *Id*. She testified that the "source of the information was a computer which monitored Southwestern Bell's switching

operations." *Id*. at 432. The court concluded that "these records were uniquely reliable in that they were computer-generated rather than the result of human entries." *Id*.

The same is true here. The spreadsheets and the raw data therein were computer-generated and not the result of human entries.[9] They are not, therefore, subject to the hearsay rule nor do they need to satisfy the requirement of the business records statute to be admissible. Rather, admissibility is established by determining whether the processes involved were reliable and accurate. *See Reynolds*, 456 S.W.3d at 103-05; *Dunn*, 7 S.W.3d at 430–32. Rapson's testimony demonstrates that they were. The raw data in the spreadsheet is automatically extracted from the cell phone by Sprint computers at the time a call is made or received and then automatically stored in a Sprint database. Thus, the creation of the data itself involved no human entries. And, the creation of spreadsheets is also entirely computer-generated after the initial ministerial entry of two objective search terms by a Sprint employee. Rapson attested that in her extensive experience with this process, the spreadsheets accurately reflect the raw data. Moreover, the accuracy of some of that data was corroborated by Brockman's testimony about the various calls between her and Hamm on the day of the murders. As in *Reynolds* and *Dunn*, the computer processes involved here were uniquely reliable because they lacked human participation.

For similar reasons, Hamm's reliance on the Confrontation Clause is also misplaced. The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI; *see also* MO. CONST. art. 1, §18(a) ("the accused shall have the right . . . to meet the witnesses against him face to face"). The Confrontation Clause "demands

---

[9] Hamm's hearsay challenge is ostensibly to all of the files on the disk, but his arguments pertain solely to the spreadsheets and not the cover letter, screenshot, or interpretation keys.

16

that all testimonial evidence be excluded unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." *State v. March*, 216 S.W.3d 663, 665 (Mo. banc 2007) (citing *Crawford v. Washington,* 541 U.S. 36, 68 (2004)). Here the allegedly "testimonial evidence" is computer-generated spreadsheets containing computer-generated cell phone data. No human declarant made the statements in these documents. Thus, there is no person making statements out of court against Hamm and thus no witness to confront with cross-examination. There is only the Sprint computer system. "Unsurprisingly, courts have agreed that the Confrontation Clause does not apply to information generated by machines":

> The clause limits its reach to "witnesses." The word "witness" has a common meaning covering "one" (i.e., a person) "who gives testimony." The backdrop against which the clause was enacted also confirms that it existed to prevent the use of a *person*'s out-of-court statements to convict the defendant. This text and history show that the clause encompasses statements by people, not information by machines. A computer system that generates data and inputs the data into a report cannot be described as a "witness" that gives "testimony." If the system were the witness, how would the government make it available for cross-examination? Would it have to be asked questions in computer code?

*United States v. Miller*, 982 F.3d 412, 437 (6th Cir. 2020) (internal citations omitted) (emphasis in original) (collecting cases).

Hamm suggests that the declarant here is Floyd, the technician who presumably input the query that initiated the computer's generation of the spreadsheets. But, other than her cover letter delivering the spreadsheets to the requesting officer, there is nothing in Exhibit 171 that could constitute a statement or representation by Floyd about the data in those spreadsheets. *Cf. Bullcoming v. New Mexico*, 564 U.S. 647, 660 (2011) (finding that blood alcohol report containing a *person'*s "representations, relating to past events and human actions not revealed in raw, machine-produced data" were subject to the Confrontation Clause). Inputting a phone number and

date range and pressing "enter" did not convert the data the computer retrieved nor the spreadsheet it generated into Floyd's statements for purposes of the Confrontation Clause.

In sum, Exhibit 171 was sufficiently authenticated and the process by which the computer generated the cell phone records was sufficiently reliable and accurate. Likewise, the court committed no error under the Confrontation Clause by admitting that exhibit. Hamm has failed to demonstrate any error in admitting Exhibit 171. Because his claim of error in admitting Exhibit 172 rests entirely on finding Exhibit 171 inadmissible, that claim also fails.

Points V, VI, and VII are denied.

### *Sentencing*

Hamm argues that the circuit court plainly erred by sentencing Hamm to life in prison on each of the armed criminal action counts. "Being sentenced to a punishment greater than the maximum sentence for an offense constitutes plain error resulting in manifest injustice." *State v. Yount*, 642 S.W.3d 298, 300 (Mo. banc 2022) (internal quotation marks and citations omitted). But Hamm was not sentenced beyond the maximum penalty for armed criminal action because no such maximum is provided in the version of the statute under which he was convicted. Section 571.015.1, RSMo 2016, provides that a person convicted of armed criminal action "shall be punished by imprisonment by the department of corrections and human resources for a term of not less than three years."[10] Because the legislature included only a minimum and no maximum penalty in this statute, the Supreme Court has stated that a defendant may be sentenced to any term of years above the minimum, *including life. See e.g., State v. Clark*, 197 S.W.3d 598, 602 (Mo. banc 2006). Based on that language, courts have affirmed life sentences under this version of the

---

[10] Effective August 28, 2020, the range of punishment under this provision is three to fifteen years in prison. § 571.015.1, RSMo Supp. 2021.

18

armed criminal action statute. For example, in *State v. Freeman*, the defendant argued on appeal that his consecutive life sentences for assault, robbery, and armed criminal action constituted cruel and unusual punishment. 702 S.W.2d 869, 874 (Mo. App. S.D. 1985). The court rejected that argument after finding that "[l]ife imprisonment is an authorized punishment for armed criminal action." *Id*. (citing *State v. Kirksey,* 647 S.W.2d 799, 801 (Mo. banc 1983) (affirming life sentence on armed criminal action, finding it authorized by the statute)). Because "life imprisonment" was within the statutory limit of punishment imposed for armed criminal action, the court in *Freeman* affirmed that sentence. 702 S.W.2d at 876; *see also State v. Grissom*, 423 S.W.3d 330 (Mo. App. E.D. 2014) (affirming life sentence, in per curiam order, where the defendant claimed his life sentences on three armed criminal action convictions were "contrary to § 571.015.1").

Despite this controlling case law regarding the armed criminal action statute, Hamm insists that life in prison is not the equivalent of a "term" of years, citing a case discussing a completely different statute. In *State v. Hardin*, the Court noted that the two options for punishment under the forcible rape statue—either "life imprisonment" or a "term of years not less than five years"—are not necessarily equivalent in all cases, rejecting an argument that the phrase "life imprisonment" was superfluous. 429 S.W.3d 417, 419 (Mo. banc 2014) (citing § 566.030, RSMo Supp. 2009). Contrary to Hamm's assertion, *Hardin* does not mandate the conclusion that under *any* statute that authorizes only a term of years sentence, a life sentence is unauthorized. Nor would such a conclusion square with the above precedent holding that a life sentence is authorized under the applicable version of the armed criminal action statute.

Because the life sentences for armed criminal action were authorized, the circuit court did not err—plainly or otherwise—in imposing them.

Points VIII and IX are denied.

## IV. Conclusion

The judgment is affirmed.

_____
John P. Torbitzky, J.

Michael E. Gardner, P.J. and
Renee Hardin-Tammons, J., concur.